Hugh A. DAVIDSON, Appellant,

v.

STATE of Alaska, Appellee.

No. 4351.

Court of Appeals of Alaska.

April 8, 1982.

---

Saul R. Friedman and Edward P. Nolde, Hedland, Fleischer & Friedman, Anchorage, and Hugh A. Davidson, pro se, Lompoc, Cal., for appellant.

John A. Scukanec, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., COATS, J., and HODGES, Superior Court Judge.*

## OPINION

COATS, Judge.

Hugh A. Davidson appeals to this court from his convictions for murder in the second degree,[1] burglary,[2] and two counts of assault with a dangerous weapon.[3] Davidson also appeals his sentence.[4] We affirm Davidson's conviction and sentence, but remand to the trial court for reconsideration of Davidson's new trial motion.

The trial in this case involved two incidents. The first incident took place on September 19, 1977, and resulted in Davidson being convicted of assault with a dangerous weapon on Peggy Horn. The second incident took place on September 25, 1977, and resulted in Davidson being convicted of the murder of Nathaniel Rayford, a second assault with a dangerous weapon on Peggy Horn, and burglary.

Hugh "Tony" Davidson and Peggy Horn lived together for approximately three years in Anchorage. After Horn stopped living with Davidson she moved into a trailer where she lived with Louis Mosby. Horn and Mosby shared one bedroom in the trailer, and the other bedroom was shared by Vanessa Davidson, a sister of Tony Davidson, and her boyfriend, Nathaniel Rayford.

On the afternoon of September 19, 1977, Tony Davidson met Peggy Horn at the Sears Mall as she was leaving work for lunch. Horn's testimony concerning the first assault follows. According to Horn, Davidson drove her to a taco wagon for lunch, but afterwards refused to take her

back to work or let her leave his car. Instead, Davidson drove her south out of Anchorage on the New Seward Highway. When they reached the Girdwood area, Davidson pulled a loaded handgun from under the seat and began talking of killing Horn and then committing suicide. As he talked, Davidson pointed the gun at both Horn and himself. Davidson and Horn were parked near Girdwood for quite some time. When they left, Davidson drove further south toward Kenai or Seward instead of returning to Anchorage. During this drive, Davidson stopped and threatened Horn with the handgun at least once more, and Davidson repeatedly asked Horn if they could become romantically involved again.

At approximately midnight Davidson and Horn finally returned to Anchorage. Davidson released Horn from the car at an all-night restaurant, where her mother picked her up. Horn promptly called the police to report that she was home since Vanessa Davidson had reported her missing. She filed a complaint against Davidson the next morning.

Tony Davidson's testimony about this incident was quite different from Horn's. Davidson testified that after meeting Horn that afternoon, which they had agreed to do, Horn voluntarily accompanied him for a drive down the New Seward Highway. They ended up parking the car near Portage Glacier and talking. Davidson showed Horn a gun, and both of them handled it, but he said he never assaulted her with it. Davidson indicated that it surprised him when his other sister Valerie told him that Peggy Horn had filed charges against him.

On September 25, 1977, the second and more critical incident took place. That af-

* Jay Hodges, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. Former AS 11.15.030.

2. Former AS 11.20.080.

3. Former AS 11.15.220.

4. Davidson was sentenced to consecutive sentences of 25 years for murder and five years for one of the counts of assault with a dangerous weapon. Concurrent to these, Davidson was sentenced to eight years for burglary in a dwelling and to four years for the other count of assault with a dangerous weapon. Davidson's sentence was therefore a composite of 30 years.

ternoon Davidson met Louis Mosby at the Leisure Corner, where Mosby worked, and they discussed the possibility of Peggy Horn dropping the charges against Davidson. Mosby and Davidson tentatively agreed to meet to talk things over later that evening at the trailer where Horn and Mosby lived.

Upon leaving the Leisure Corner, Davidson had his sister Valerie drive him out to Mosby's trailer. When he arrived, Davidson managed to break into the trailer by removing a window pane and reaching in and unlocking the door. After opening the door, Davidson returned to the car and removed a brief case containing a loaded sawed-off .22 caliber rifle and a rifle case containing another loaded rifle. He took these into the trailer. While remaining inside, Davidson had Valerie latch the outside door so that it would not appear that anyone had entered the trailer. Valerie then left Davidson in the trailer.

At about 4:45 p. m. Tony Davidson called Louis Mosby at the Leisure Corner. Mosby told Davidson that he and Nathaniel Rayford would meet Davidson at a bar called the Monkey Wharf later that night instead of at the trailer.

At approximately 5:30 p. m. Louis Mosby and Nathaniel Rayford picked up Peggy Horn at the Sears Mall and drove to the trailer. Rayford entered the trailer first, followed by Horn. Horn then yelled, "He's got a gun... Tony's got the gun." Mosby ran from the trailer to a friend's trailer.

Again, two diametrically opposed versions of what happened in the trailer emerged at trial. First, Peggy Horn testified that as she entered the trailer she saw Davidson inside the trailer pointing a handgun at Rayford and her. The handgun was later identified as Louis Mosby's .357 magnum revolver which had been under the bed in Mosby's and Horn's room. Davidson pulled her inside the trailer and had her sit facing him while he sat next to Rayford on the couch. Davidson asked Rayford for his car keys and as Rayford started to comply, he asked Davidson if he could ask a question. Davidson told him to go ahead, and Rayford asked why he was doing this to them. Davidson replied, "You never talked to me," and then turned to Horn and said, "You lied to me, you lied to me." At that moment Davidson shot Rayford in the chest. Davidson then pointed the weapon at Horn and she begged him not to shoot her. Davidson then lowered the gun and told her to come with him in Rayford's car.

Davidson testified at trial that Horn was responsible for Rayford's death. He indicated that he went to the trailer to return a rifle to Peggy Horn. He admitted to breaking into the trailer without permission but denied that he intended to assault anyone within the trailer. According to Davidson, Rayford came into the trailer first and sat on the couch. When Peggy Horn entered the trailer she yelled, "It's Tony, it's Tony." Davidson looked out the window and saw Louis Mosby running down the street. Davidson concluded that Mosby would probably call the police and therefore asked Nathaniel Rayford for his car keys. At this point Peggy Horn, who had been in the other room, came out and pointed the .357 magnum at Davidson. He testified that he lunged for the gun and in the struggle the gun went off, wounding Rayford in the chest. Davidson then told Peggy Horn he was leaving, and she said she was going with him. Davidson and Horn got in Rayford's car and left. Davidson was arrested by the police shortly after leaving the trailer.

Rayford died of the wound to the chest, and Davidson was charged with his murder. Davidson was also charged with burglary in a dwelling, for breaking into the trailer with the intent to commit an assault, and with assault with a dangerous weapon, for assaulting Peggy Horn. Davidson was convicted by a jury of these charges and of the earlier assault with a dangerous weapon charge based upon the September 19, 1977, assault of Peggy Horn.

## THE UNAUTHORIZED EXHIBITS

Davidson's main point on appeal concerns his objection to the fact that por-

tions of a statement by his sister Valerie Davidson and portions of a letter which he wrote to Peggy Horn went to the jury room and were read by the jury even though the court had specifically ruled that those portions of Valerie Davidson's statement and his letter were not admissible.

On September 28, 1977, Valerie Davidson made a statement to the police describing what happened when she took Tony Davidson to the trailer on September 25, before the incident when Nathaniel Rayford was shot. Valerie Davidson's statement consisted of thirteen typed pages in a question-and-answer format. Valerie was called as a witness at Tony Davidson's trial and testified to most of the things which she said in her statement to the police. However, the court granted protective orders forbidding the prosecution from introducing into evidence certain aspects of the statement. First, Valerie stated that Tony Davidson had told her that he had taken one of the guns which he took out to the trailer in a burglary of Peggy Horn's father's house. Tony Davidson indicated that he was going to return the gun to Peggy Horn to give back to her father. The trial court ruled that evidence that Tony Davidson had stolen one of the weapons which he took to the trailer was inadmissible because the probative value of the evidence was outweighed by the danger of unfair prejudice to Davidson. Alaska R.Evid. 403. Second, Valerie said in her statement that when she took Tony Davidson out to the trailer she believed that Tony was planning to shoot Peggy Horn and then himself. The statement made it clear this was not based upon anything Tony Davidson had said. The trial court ruled that this evidence was inadmissible because it was merely a speculative opinion on what Tony Davidson's intent was when he went out to the trailer.

A letter which Tony Davidson had written to Peggy Horn also was admitted at the trial. However, the trial court had granted a protective order excising a certain section in which Davidson wrote to Horn, ". . . this

4½ months I've been in this god-forsaken place I can't help but to remember when I was locked up before how different it was than this and how I looked forward to your letters day by day." The court struck this and other language which might have indicated to the jury that Davidson was incarcerated on the ground that the probative value of the evidence was outweighed by the danger of unfair prejudice. Alaska R.Evid. 403.

After the case was submitted to the jury, the court instructed counsel to make sure that only the proper exhibits went into the jury room during the jury deliberations. However, both counsel left it to court personnel to check the exhibits.

After the jury had been in deliberations overnight, the court received a communication from the jury foreman which indicated that the jury had the full statement of Valerie Davidson in its possession, including the portions about the stolen gun and Valerie's belief that Davidson was going to shoot Peggy Horn and then himself, which the court had held inadmissible. The foreman indicated that Valerie Davidson's statement was not marked as an exhibit, and he requested further instructions from the court. Further inquiry by the court showed that the jury also possessed the full letter written by Tony Davidson to Peggy Horn, including the sections which the court had ordered excised because they referred to Davidson's incarceration. The jury foreman indicated that the jury had read Valerie Davidson's statement and Tony Davidson's letter.

The court, with the concurrence of counsel, inquired of each juror individually whether the juror would disregard the portions of the statement and letter which had not been admitted in evidence if he was so instructed by the court. The jurors all responded that they could disregard that evidence.

After a short recess, Davidson and his attorney returned to court and requested a mistrial. The court took the motion under

advisement. The court then called the jury back into the courtroom and instructed them to disregard the portions of the statement and letter which were not admitted into evidence.

After excusing the jury to continue their deliberations, the trial judge indicated that he was inclined to grant the mistrial and that if it was appropriate to grant the mistrial, he believed that the mistrial should probably be granted before the jury returned its verdict. The trial judge said he was going to try to do some research on the issue before deciding it. About two hours later, Davidson withdrew his motion for a mistrial, indicating he wanted to have a decision from the jury. The trial court allowed Davidson to withdraw the motion. The jury returned with verdicts finding Davidson guilty.

On appeal Davidson argues that his withdrawal of his motion for a mistrial was not voluntary under the circumstances. He argues that the trial court should have taken the mistrial motion under advisement to let Davidson have a decision from the jury and should have granted the mistrial after the jury returned with a guilty verdict. Davidson points out that this was his second trial on the same charges. His first trial ended after several days when an earlier motion for a mistrial was granted. The second trial started on July 5, 1978, and ended on July 21, 1978. The state counters that Davidson never asked the trial court to take the motion for a mistrial under advisement pending the verdict and that by withdrawing his motion for a mistrial, Davidson withdrew his objection to the fact that Valerie Davidson's statement and his letter to Peggy Horn went to the jury.

Although we are troubled by the fact that these unauthorized exhibits went into the jury room, we find that we must agree with the state. Davidson withdrew his motion for a mistrial and left the trial judge with no motion before him. We believe this case is governed by *Owens v. State*, 613 P.2d 259 (Alaska 1980), where the court held that the defendant's failure to move for a mistrial and his refusal to allow the court to inquire into whether the jury heard a radio broadcast concerning his case precluded the court from taking action to counteract any possible prejudice to him. In that case, the court held that since the trial judge was precluded from taking any action to counteract any prejudice, the defendant waived the right to assert any error on appeal. Admittedly, Davidson's case is more difficult than the *Owens* case. Davidson's objection to the fact that the unauthorized evidence was in the jury room was clear. The trial court was able to take reasonable steps to attempt to preclude jury prejudice. However, by withdrawing his motion, Davidson prevented the trial judge from taking action which he could have taken had the mistrial motion been before him. Had the motion been before him, the trial judge could have conducted an evidentiary hearing to determine how the unauthorized exhibits got into the jury room, and he could have made findings as to whether the unauthorized exhibits had any prejudicial impact. By unconditionally withdrawing his motion, Davidson prevented the trial judge from taking these or other steps.[5] Of course, the trial judge could have taken these steps on his own without any motion. However, we do not believe the trial judge was required to act on his own to rule on a mistrial motion

5. It is also significant that after Davidson had made his motion for mistrial, the judge stated that although he was inclined to think that a ruling on the motion should be made before the jury returned a verdict, he would have to do additional research before ruling on whether the motion could be taken under advisement in order to give Davidson the benefit of the jury's decision in the event of an acquittal. Despite the judge's statement, Davidson made no request for a ruling on this issue but instead withdrew his motion for mistrial before the judge could make a final decision indicating whether he would defer ruling on the motion until after a verdict was reached. Thus, Davidson's own unconditional withdrawal of his mistrial motion deprived the trial judge of any chance to grant the very relief that he now contends he was entitled to.

which Davidson had withdrawn. We therefore find no error.

## MOTION FOR A NEW TRIAL

Davidson argues that the trial court erred in denying his motion to allow him to file an untimely motion for a new trial. Alaska Criminal Rule 33, which governs new trial motions, reads as follows:

> The court may grant a new trial to a defendant if required in the interest of justice. If trial was by the court without a jury the court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 5 days after verdict or finding of guilt, or within such further time as the court may fix during the 5-day period.

Davidson was found guilty by the jury on July 21, 1978. Under the rule his motion for a new trial should have been filed within five days of that date. Davidson's trial counsel filed a motion requesting permission to file an untimely motion for a new trial on October 9, 1978, more than two months late. Davidson's trial counsel claimed in an affidavit that other trials and the management of other cases had prevented him from filing the motion and that Davidson had not intended to waive the motion. The new trial motion asked for a new trial because

the unauthorized exhibits were introduced into the jury room.

In opposing the motion to allow the late filing of a new trial motion, the state pointed out that under Federal Rule of Criminal Procedure 33, which is nearly identical to Alaska Criminal Rule 33, the time limits for filing a new trial motion are jurisdictional. 2 C. Wright, *Federal Practice and Procedure* § 558 (1969). The trial court denied Davidson's motion to allow him to file an untimely new trial motion. Since the record on appeal does not show any reasons for the trial judge's decision, we are unable to tell whether the trial judge predicated his refusal to consider the new trial motion on the belief that the court had no jurisdiction to consider the issue or whether he based that ruling on a different ground.

■ We do not believe that the time limits of Alaska Criminal Rule 33 are jurisdictional. We rest our holding on Criminal Rule 53 which reads:

> These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice.

We believe this rule allows the trial court to relax the time limits in Criminal Rule 33.[6]

■ Since on the record before us we are unable to determine whether the trial court denied Davidson's motion to file a new trial motion on the ground that it lacked jurisdiction, we remand to the trial court for clarification of this issue.[7] If the trial judge formerly ruled that he had no

**6.** The federal rules do not have a rule similar to our Criminal Rule 53. We find it persuasive that the Alaska Supreme Court has used Criminal Rule 53 to relax time limits under Criminal Rule 35(a) for motions for reduction of sentence. *Wheeles v. State,* 566 P.2d 1013 (Alaska 1977); *Jones v. State,* 548 P.2d 958 (Alaska 1976); *accord, Taylor v. State,* 564 P.2d 1219 (Alaska 1977); *cf. McCracken v. State,* 482 P.2d 269 (Alaska 1971) (where strict adherence to Supreme Court Rule 19(b) time limitations on appeals would work an injustice, those limi-

tations should be relaxed under authority of Supreme Court Rule 52). Federal courts have held that the time limits for motions to reduce sentence under their Criminal Rule 35(a) are jurisdictional. 8A J. Moore, Moore's Federal Practice, § 35.02[2] (2d ed. 1981).

**7.** The main focus of Davidson's point on appeal on the new trial motion, which he raises *pro se*, appears to be that he was not present during the proceedings concerning his new trial motion. Since we are remanding on the new trial

jurisdiction to consider the new trial motion, we reverse the ruling and direct the court to rule on whether it should consider the new trial motion. If the trial court decides that it should not relax the rules under Criminal Rule 53, Davidson may have grounds for relief under Criminal Rule 35(c), which does not have such stringent time limits.[8]

## SENTENCE APPEAL

Davidson also appeals his sentence on the ground that it is excessive. Davidson was sentenced to twenty-five years for second degree murder. He was sentenced to concurrent sentences of eight years for burglary in a dwelling and four years for assault with a dangerous weapon. All these charges arose from the events of September 25, 1977, when Nathanial Rayford was killed. Davidson was sentenced to five years consecutively for the assault with a dangerous weapon on Peggy Horn which occurred on September 19, 1977. The total sentence is thus thirty years' imprisonment.

Davidson was twenty-two at the time of his sentencing. He has an extensive juvenile record involving property crimes and has been institutionalized several times in McLaughlin Youth Center in rehabilitation programs. At the age of fourteen he was declared to be a delinquent minor as the result of a joyriding violation. He was first institutionalized as the result of another joyriding offense committed that same year (1970). In 1973 he was again institutionalized on a larceny from a person charge. Davidson was released from McLaughlin Youth Center on his eighteenth birthday. Except for traffic offenses, his only adult conviction was for possessing marijuana while operating a motor vehicle for which he was sentenced to a $400 fine with $200 suspended.

In sentencing Davidson, the trial judge was clearly familiar with the extensive presentence report. His sentencing remarks indicate that the sentence which he imposed was not designed primarily to achieve Davidson's rehabilitation. He indicated that Davidson had demonstrated that he was a dangerous offender by threatening others with firearms and ultimately com-

---

motion we do not find it necessary to decide this point. Davidson and his counsel can decide on remand whether to file a motion requesting Davidson's presence at the new trial motion.

**8.** Davidson raises several other issues which we deal with summarily as follows:

1. Whether the trial court properly allowed Trooper Clontz to testify to Peggy Horn's statement: we hold that the trial court acted within its discretion in determining that these statements were excited utterances. Alaska R.Evid. 803(2); *State v. Agoney*, 608 P.2d 762 (Alaska 1980).

2. Whether the trial court erred in failing to dismiss the burglary count against Davidson because the prosecution failed to present exculpatory evidence to the grand jury: we find that Valerie Davidson's statement that Tony Davidson told her he was going to the trailer to return a rifle to Peggy Horn was not exculpatory evidence which the prosecution was required to present to the grand jury under *Frink v. State*, 597 P.2d 154, 165–66 (Alaska 1979).

3. Whether the trial court committed error in denying Davidson's motion to sever the charge of assault with a dangerous weapon on Peggy Horn on September 19, 1977: we hold

that the trial court acted within its discretion in allowing this count to be joined with the others and in denying severance. We agree with the trial court that Davidson's actions can be viewed as a continuing course of conduct. Furthermore, it appears that even if the charges were severed, evidence of the first assault with a dangerous weapon would have been admissible in the murder trial to prove criminal intent or motive or to show a common scheme or plan. Alaska R.Evid. 404(b).

4. Whether the trial court erred in failing to give Davidson's instruction on assault: the proposed instruction defined an assault as "the intentional attempt to do injury to the person of another by violence coupled with the present ability to do the injury attempted." However, an intent to cause *apprehension* of an immediate injury is a sufficient mental state to support an assault conviction. *State v. Silas*, 595 P.2d 651 (Alaska 1979). The trial judge thus properly instructed the jury.

5. Whether the trial court committed error in giving the general intent instruction: no objection was made to this instruction at trial. The instruction is certainly not plain error. *See Calantas v. State*, 608 P.2d 34 (Alaska 1980).

mitting a murder. The trial judge emphasized that the sentence was designed to isolate a dangerous offender from society, to deter Davidson and others who might commit similar crimes, and to reaffirm societal norms which condemn those who commit violent crimes.

We do not believe the trial court was clearly mistaken in imposing this sentence. Given Davidson's extensive juvenile record, the fact that prior efforts at rehabilitation had failed when Davidson was institutionalized on juvenile charges, and the serious nature of the charges against him, we find the trial judge acted within his discretion in imposing this substantial period of incarceration.[9]

AFFIRMED in part and REMANDED in part for further proceedings.

SINGLETON, J., not participating.

9. Davidson argues in his reply brief that the court did not have sufficient psychiatric evidence available for sentencing and should have had a psychiatric examination performed. Davidson never objected to the lack of psychiatric data at sentencing. Furthermore, the presentence report contains a brief psychiatric report from Dr. Aron Wolf, who examined Davidson shortly before sentencing. The trial judge considered this report in fashioning Davidson's sentence. The judge recommended that Davidson be institutionalized where psychiatric counseling is available. We believe the record shows that Davidson's psychiatric background was presented to the trial judge and was adequately considered.