**Kiven COLLINS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2125.**

Court of Appeals of Alaska.

Sept. 8, 1989.

Rehearing Denied Sept. 29, 1989.

Linda K. Wilson, Asst. Public Defender, and John Salemi, Acting Public Defender, Anchorage, for appellant.

W. H. Hawley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Kiven Collins was convicted by a jury of four counts of first-degree murder and one count of attempted first-degree murder. Superior Court Judge S. J. Buckalew, Jr., sentenced Collins to consecutive terms totaling 403 years in prison. Collins appeals, contending that the trial court erred in

denying his motion to sever Count I of the indictment, in refusing to suppress his confession, and in admitting evidence of other misconduct. Collins also complains that his sentence is excessive. We affirm.

On August 5, 1986, Kiven Collins shot and killed Melvin Miranda. In a separate incident on the following day, August 6, Collins shot Lisa Macon, Julio Paulino, Fannie Patterson, and Carlos Gomez. Only Gomez survived.

The police arrested Collins shortly after the second shooting. Collins gave the police a detailed account of both the August 5 and August 6 incidents. Collins had been involved in the lower echelons of an organized ring of cocaine traffickers in Anchorage. According to Collins, two of the leaders of the ring, Juan Javier and a man named "Nunes," had promised to pay Collins $25,000 to kill Miranda, who was in charge of a rival group. Collins agreed to do the job and killed Miranda on August 5. The following day, Collins visited an apartment in which several persons associated with his drug ring were present. Among those present were Macon, Paulino, Patterson, and Gomez. Collins claimed that he overheard conversations that led him to believe that members of his organization wanted Collins dead. Collins told the police that he shot Macon, Paulino, Patterson, and Gomez because he was afraid that they were about to kill him.

As a result of the two shooting incidents, the state charged Collins with four counts of first-degree murder and one count of attempted first-degree murder. The state's theory of the Miranda murder conformed to Collins' confession. The state's theory of the August 6 murders and attempted murder was that Collins thought that other members of the drug ring planned to kill him due to his participation in the Miranda killing and that he decided to shoot them before they had an opportunity to carry out their plan.

Prior to trial, Collins moved to sever Count I of his indictment, charging the August 5 murder of Melvin Miranda, from the remaining counts. The superior court denied Collins' motion. On appeal, Collins maintains that the trial court erred in failing to grant his motion for severance. Collins argues that Count I related to a separate incident and was improperly joined. He also contends that, even if it was proper for the state to join the charges in the first instance, the prejudice resulting from joinder required severance. We find no merit to these arguments.

Joinder of offenses is governed by Alaska Criminal Rule 8(a), which provides:

> *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies, misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

In the present case, all of Collins' offenses were "of the same or similar character," namely, murder and attempted murder. More significantly, they were clearly "connected together." Although the offenses arose out of two separate incidents, the incidents occurred only a day apart and were intimately related. The only disputed issues in Collins' case pertained to the August 6 shootings. Under either the state's version or Collins' version of the second incident, the first incident—the August 5 shooting of Miranda—was crucial. Under both versions, the August 6 shootings resulted from Collins' belief that he was going to be killed because of his role in the August 5 crime. Consequently, knowledge of the August 5 shooting was indispensable to an understanding of the events of August 6.

Given the close temporal and circumstantial relationship between the offense charged in Count I and the offenses charged in the subsequent counts of the indictment, joinder of the charges was permissible under Criminal Rule 8(a). *See Maynard v. State*, 652 P.2d 489, 491 (Alaska App.1982); *Davidson v. State*, 642 P.2d 1383, 1390 n. 8 (Alaska App.1982).

██ We must separately inquire whether severance should have been ordered even though the offenses were properly joined in the first instance. Severance is governed by Alaska Criminal Rule 14, which provides:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

Collins suggests that automatic severance should have been granted under *Stevens v. State*, 582 P.2d 621, 629 (Alaska 1978). *See also Velez v. State*, 762 P.2d 1297 (Alaska App.1988); *Johnson v. State*, 730 P.2d 175 (Alaska App.1986). The rule of automatic severance announced in *Stevens*, however, applies only when cases are joined solely because they involve offenses of similar character. In the present case, not only were Collins' offenses properly joined because they were similar in character, but joinder was independently appropriate because the offenses were based "on two or more acts ... connected together." Alaska R.Crim.P. 8(a). The *Stevens* rule of automatic severance was therefore inapplicable.

Moreover, as we have already indicated, evidence of Collins' role in the Miranda murder would clearly have been admissible in a separate trial on the remaining charges against him to establish his motive. *See Dorman v. State*, 622 P.2d 448, 460 (Alaska 1981); *Ladd v. State*, 568 P.2d 960, 968 (Alaska 1977). Given the relevance of the Miranda murder, it was incumbent upon Collins to make a specific and convincing showing of prejudice before severance would be required. He made no such showing. *See Cleveland v. State*, 538 P.2d 1006, 1008 (Alaska 1974); *Montes v. State*, 669 P.2d 961, 965–66 (Alaska App. 1983). We conclude that the trial court did not err in denying Collins' motion to sever.

Collins next contends that his confession was involuntary and should not have been used against him at trial. The issue of voluntariness presents a mixed question of fact and law involving a three-step inquiry. The first step requires a determination of the historical facts surrounding the confession and is primarily for the trial court. We will reverse a trial judge's factual findings only when clearly erroneous. In the second and third steps of the inquiry, this court "has a duty to examine the entire record and make its own independent determinations as to the mental state of the accused and its legal significance." *State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987).

There is little dispute concerning the basic facts surrounding Collins' confession. Upon arrest, Collins was taken to the police station and informed of his *Miranda* rights. Following a brief colloquy, Collins signed a written waiver and agreed to speak with the police. The entire interview, including the advisement of *Miranda* rights, was tape-recorded.

██ Collins questions the voluntariness of his confession in light of blood and urine tests that revealed traces of cocaine and marijuana in his system. Although the test results do indicate that Collins was under the influence of drugs to a certain extent, this does not in itself render his confession involuntary. *Hampton v. State*, 569 P.2d 138, 144 (Alaska 1977). The transcript of the confession establishes that Collins was rational, in control of his faculties, and capable of understanding and answering the various questions that were put to him. At the close of the interview, when asked if he was under the influence of drugs or liquor, Collins stated that, although he had had a little to drink, he understood everything that had occurred.

██ Collins also challenges his voluntariness based on a series of questions that he asked at the outset of the interview, before signing a written waiver of his rights. Collins contends that his questions reflect his confusion and lack of understanding concerning his *Miranda* rights. We disagree. The questions did not relate to Collin's *Miranda* rights. Rather, Collins asked for information about the nature of the evidence that the police had against him. The

police understandably declined to disclose the specifics of their investigation and repeatedly advised Collins that they could not discuss the substance of his case unless and until Collins waived his *Miranda* rights. Collins then agreed to sign a waiver. In our view, the transcript of this portion of the interview does not indicate any significant confusion on Collins' part concerning the nature of his rights.

Our independent review of the totality of the record convinces us that the state met its burden of establishing that Collins' confession was knowing, intelligent, and voluntary. *See Sprague v. State*, 590 P.2d 410, 414 (Alaska 1979). Admission of the confession was not error.

■ Collins additionally contends that the trial court erred when it allowed testimony at trial concerning a domestic violence call made by his girlfriend on the morning of the August 6 shootings. Eight hours prior to the August 6 shootings, Officer Michelle Bales was dispatched to a domestic violence complaint filed by Collins' girlfriend, J.W., who lived in an apartment in the same complex as the apartment in which the shootings occurred. At trial, Officer Bales was called to testify that she met with J.W. and Collins at J.W.'s apartment and saw that Collins was wearing shoes similar to those later found in his apartment with human blood on them. Bales was also called to testify that she heard Collins say that J.W. could reach him at the apartment where the shootings later occurred.

Before Bales testified, Collins' trial counsel objected that her testimony would prejudice Collins if she disclosed that Collins caused the incident of domestic violence that prompted J.W. to call the police. The prosecutor assured the court that the circumstances leading to Bales' presence at the apartment would not be mentioned. Bales was thereafter permitted to testify.

In the course of her testimony, Bales did not discuss the complaint that led to her contact with J.W. and Collins. At one point in her testimony, however, she did refer to her police report of the incident: "From my police report, it—it was her that had told

him that she would call him later at apartment number 110 [the apartment in which the August 6 shootings occurred]."

On appeal, Collins contends that Bales' reference to her "police report" was tantamount to evidence of a prior bad act on Collins' part and that it should have been excluded under Alaska Rule of Evidence 404(b). *See Lerchenstein v. State*, 697 P.2d 312, 315–16 (Alaska App.1985), *aff'd*, 726 P.2d 546 (Alaska 1986). At trial, however, Collins' counsel did not object to Bales' statement or move that it be stricken. Moreover, particularly in light of the overwhelming evidence of Collins' guilt, the prejudicial impact of the disputed statement was negligible, at most. Assuming error was committed in allowing the officer to refer to her police report, the error falls far short of plain error. *See* Alaska R.Crim.P. 47(b).

■ Collins' final contention is that his sentence is excessive. For his four convictions of first-degree murder, Collins received four consecutive maximum sentences of ninety-nine years. Collins received an additional seven-year consecutive term for his conviction of attempted murder. His total sentence is thus 403 years. Collins argues that imposition of maximum consecutive sentences was clearly mistaken. Collins points out that a maximum sentence is generally reserved for a worst offender. *Hintz v. State*, 627 P.2d 207, 210 (Alaska 1981). He contends that, because he did not have a prior criminal record, he does not qualify as a worst offender.

We find no merit to Collins' contention. A worst offender finding may be based on a defendant's background, the crime for which the defendant was convicted, or both. *Hintz*, 627 P.2d at 210. In the present case, the circumstances surrounding Collins' crimes plainly justified a worst offender finding. All of Collins' offenses arose within the context of a large-scale, ongoing criminal enterprise that engaged in cocaine trafficking. The August 5 slaying of Melvin Miranda was a cold-blooded murder for hire. The multiple murders and attempted murder of the following day occurred in the aftermath of Miranda's kill-

ing and were equally reprehensible. Collins' attempt to justify the August 6 shootings as being necessary to protect himself is utterly implausible. The sentencing court found that Collins apparently shot two of his victims in their sleep, simply to eliminate the possibility that they would become witnesses against him.

Given the totality of the circumstances surrounding Collins' crimes, the sentencing court properly concluded that Collins was an extremely dangerous offender, and that consecutive sentences were required in his case for the protection of society. Despite the fact that Collins was only twenty-six years of age at the time of the offenses and had no prior felony record, the totality of the evidence places him on a par with other offenders who have committed multiple first-degree murders and for whom maximum consecutive sentences have been approved. *See, e.g., Nukapigak v. State,* 663 P.2d 943 (Alaska 1983); *Hastings v. State,* 736 P.2d 1157 (Alaska App.1987). Having independently reviewed the totality of the sentencing record, we cannot say that the sentence imposed below was clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

The judgment is AFFIRMED.

SINGLETON, Judge, concurring.

I agree with the majority's treatment of most of the issues. I am troubled, however, by the sentence in this case.

Kiven Collins was convicted of four counts of first-degree murder and one count of attempted murder. The maximum sentence for murder in the first degree is ninety-nine years. AS 12.55.125(a). Collins received the maximum sentences allowable for the first-degree murder convictions. All were to run consecutively for a total of three hundred and ninety-six years. He also received a presumptive consecutive seven-year sentence for the attempted murder charge. Thus, Collins received a composite sentence of 403 years. While this sentence finds some support in *Nukapigak*

*v. State,* 663 P.2d 943, 945–46 (Alaska 1983), *Hastings v. State,* 736 P.2d 1157, 1160 (Alaska App.1987), and *Krukoff v. State,* 702 P.2d 664, 666 (Alaska App.1985), this support is substantially undermined by *Jackson v. State,* 616 P.2d 23, 25 (Alaska 1980).

In *Jackson,* the supreme court considered whether a trial court could appropriately impose an unusually severe sentence as a means of restricting a person's parole eligibility. The court held that parole considerations are not irrelevant in fashioning a sentence. However, the court expressed concern that speculation about parole might result in an excessive sentence. 616 P.2d at 25–26. The court therefore concluded:

> We believe the correct approach is for the sentencing judge to impose an appropriate term of incarceration, considering the *Chaney* criteria [*State v. Chaney,* 477 P.2d 441 (Alaska 1970)], on the assumption that the entire term may be served. The court may then, in its discretion, designate a parole eligibility period greater than the statutory minimum, and should articulate on the record its reasons for doing so.

*Id.* at 25 (footnotes omitted).

Collins was twenty-six years old at the time he was sentenced. A twenty-six-year-old man has a life expectancy of approximately forty-four years. *See* American Council of Life Insurance, *Life Insurance Fact Book* at 92–93 (1984). Collins will not serve 403 years. This unusually long sentence was imposed simply to ensure that he would not be eligible for parole during the remainder of his life. His sentence is thus a life sentence without possibility of parole. In light of *Jackson,* the trial court should simply have imposed a ninety-nine-year sentence and, if appropriate, restricted Collins' parole. Such a restriction should then have been justified on the record. *See Newell v. State,* 771 P.2d 873, 876–77 (Alaska App.1989) (discussing limitations on parole); *Lawrence v. State,* 764 P.2d 318, 321–22 (Alaska App.1988); *Qualle v. State,* 652 P.2d 481, 486 (Alaska App.1982);

*Spencer v. State,* 642 P.2d 1371, 1377–78 (Alaska App.1982).

I realize that the supreme court in *Nukapigak* seems to treat multiple consecutive life sentences and life sentences without possibility of parole as synonymous and therefore optional with the trial court. It seems to me, however, that permitting multiple life sentences that no one could ever possibly serve simply encourages trial judges to sentence based upon passion and prejudice and not upon a reasonable evaluation of the risk a given defendant poses to the community if paroled. If parole is not further restricted, AS 12.55.115, a person receiving a ninety-nine-year sentence must serve thirty-three years (one-third of the sentence) before becoming eligible for parole. AS 33.16.100(d). Thus, at the earliest Collins could be released, if we disregard the possibility that good time computation might affect parole eligibility, he would be over fifty-nine years old. By requiring the trial judge to specifically consider parole eligibility, as *Jackson* necessitates, we encourage dispassionate sentencing. If the trial judge had a basis for concluding that Collins will still be so dangerous after reaching the age of fifty-nine that the parole authorities should not be able to release him no matter what the contemporary facts disclose, then the trial court should have set out that basis on the record. I would therefore disapprove of the practice of pyramiding life sentences.

To the extent *Nukapigak* is to the contrary, I would find that it conflicts with *Jackson.*[1]

I concur in the judgment because I believe the trial court in this case did make the necessary findings to warrant a sentence of life imprisonment without possibility of parole. I reach this result with some reluctance because Collins is a first felony offender who has never been imprisoned for a significant period of time. He has never been tested on parole. *See Lawrence,* 764 P.2d at 321–22. On the other hand, this court has had no hesitancy in affirming life sentences for juveniles convicted of single murders despite the absence of any evidence regarding their potential for rehabilitation. *See Ridgely v. State,* 739 P.2d 1299, 1302 (Alaska App. 1987); *Riley v. State,* 720 P.2d 951, 952–53 (Alaska App.1986). If ninety-nine years is an appropriate sentence for a juvenile convicted of a single first-degree murder, then ninety-nine years without possibility of parole is not clearly mistaken for someone convicted of multiple first-degree murders regardless of other considerations. This is what I understand *Hastings* to hold and it would appear that *Hastings* would govern this case as well.[2] *See Hastings,* 736 P.2d at 1160.

I am further of the view that the record in this case would support such a sentence. *See, e.g., Neal v. State,* 628 P.2d 19, 21 (Alaska 1981) (dispensing with the requirement of specific fact-findings under circum-

---

1. In *Pears v. State,* 698 P.2d 1198, 1204–05 (Alaska 1985), the plurality seemed to conclude that even in cases of reckless murder, sentences of ten years or less would serve the goals of rehabilitation, deterrence, and reaffirmation of community norms, leaving only a need for isolation to justify a longer sentence.

   Reading all of the cases together, this court and the supreme court may be willing to permit a sentence of ninety-nine years for a planned first-degree murder without necessarily requiring a finding of a need for isolation. Nevertheless, to go beyond a sentence of ninety-nine years should require a finding of a need for isolation. Such a finding would be the equivalent of the finding needed to restrict parole required by *Jackson.*

2. A defendant who has a history of violence and then commits multiple first-degree murders clearly qualifies for a sentence of life without possibility of parole. *See Krukoff v. State,* 702 P.2d at 666. A first offender presents a more difficult case but *Hastings* seems to compel affirmance. Hastings killed six people while Collins killed four. Hastings engaged in more bizarre behavior. Nevertheless, this court emphasized the number of victims and the planning of the murders when it affirmed Hastings' sentence. *Hastings,* 736 P.2d at 1160. Applying this standard to Collins' conduct supports an affirmance of Collins' sentence because Collins, like Hastings, apparently planned multiple killings. The fact that Hastings killed two more people than Collins did would not appear significant to the analysis in the *Hastings* decision.

stances where record indicates defendant's propensity for future criminal conduct). Given that Collins remorselessly killed four individuals and given the absence of anything in the record to suggest a potential for rehabilitation, I would not expect that a remand in this case for further fact-findings would make any difference in the result.