Adolph LERCHENSTEIN, Appellant,

v.

STATE of Alaska, Appellee.

No. 7729.

Court of Appeals of Alaska.

April 5, 1985.

Linda R. MacLean, Drathman & Weidner, Anchorage, for appellant.

Michael S. McLaughlin, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Adolph Lerchenstein was charged with three counts of assault in the third degree and one count of murder in the first degree. Following a jury trial, Lerchenstein was convicted on all four counts and sentenced to serve four years on one count of assault, three years on each of the other two assault counts, and sixty years on the murder count, all to run concurrently. Lerchenstein appeals his conviction and his sentence, raising three points of error. First, he contends certain evidence of prior bad acts should have been excluded. Second, he asserts that the trial court should have given his transitional jury instruction rather than the trial court's. Third, he appeals his sentence as excessive.

On May 17, 1982, at approximately 1:00 p.m., Adolph Lerchenstein, owner of Alert TV, phoned Custom Coach Auto Body, which is located across the street from Alert TV. He spoke with Michael Hoffman, a co-owner of the auto repair shop. Lerchenstein called to inquire about the progress of an estimate for repair work on his truck which he had left at Custom Coach a week earlier. When Hoffman informed Lerchenstein that the estimate was not ready, an argument ensued in which, according to Hoffman and not disputed by other evidence, Lerchenstein became extremely angry, and in a rash tone cursed Hoffman and made disparaging remarks about his business. Hoffman requested that Lerchenstein come get his truck.[1]

Lerchenstein sent an employee across the street to Custom Coach to retrieve the truck. When the employee arrived, Hoffman told him that a thirty-five dollar storage fee would be charged on the truck. Hoffman testified that he decided to charge this fee, which he did not customarily collect, because he was angry about Lerchenstein's comments to him on the phone. The employee returned to Alert TV.

A short time later, Lerchenstein crossed the street and entered his truck. Michael Hoffman approached the window of the truck with a bill and told Lerchenstein that he owed the storage fee. At this point, Hoffman testified, Lerchenstein "started acting real erratical.... [H]e was inside the truck and he just started jumping up and down...." Hoffman testified he told Lerchenstein that he was going to call the police, and then walked down the side of and behind the truck.

At this point the particular events giving rise to the charges occurred. Lerchenstein drove his truck in reverse (there was a large sand pile in front of the truck), striking Michael Hoffman and dragging him beneath the vehicle as Hoffman held on to the bumper. Lerchenstein stopped travel-

---

**1.** On direct examination Michael Hoffman gave this account of the phone conversation:
Q. And tell us about the conversation.
A. Okay. He just—he called me up and he wanted to know if I had his estimate completed, and I explained to him that I didn't have it done yet, but I was still working on it and for some reason, he just started getting real rude and abrupt with me.
Q. What do you mean by that?
A. Well, he just started ranking on my business and asked me if I was running a shoestring operation or something like that and I replied, you know, that I'm working on his estimate as much as I can and, you know, maybe it'd be another day or so before I could get it done.

Q. How did he react to that?
A. He didn't like it. He flew off and said something about you assholes or something like that, and then finally I told him, I says, well, Adolph, I says, if that's the way you feel about it, why don't you just come and get your truck, and, you know, no problem, you just go ahead and come over and pick it up and, you know, and go ahead and take it somewhere else, matter of fact, I prefer you do that.
Q. And he said?
A. He just said, well, okay, you butt fucker, if that's the way you want it, and then he hung up.

ling in reverse and apparently began to shift to drive. The truck stalled. Around this time Don Hoffman, Ron Hoffman, and Lance DeSaw ran towards Lerchenstein's truck. Michael Hoffman's brother, Don Hoffman, reached the truck on the passenger's side. Don Hoffman testified that he opened the door of the cab and climbed partly onto the front seat of the truck. He then noticed a handgun on the seat. Lerchenstein picked up the gun and pointed it in Don Hoffman's direction, but did not fire. Don Hoffman slid out of the truck. At about the same time another Hoffman brother, Ron, reached the driver's side of the truck, along with DeSaw, co-owner of Custom Coach. Both reached in through the window on the driver's side. Ron Hoffman had a cast on his wrist at the time. At some point after Don Hoffman slid out of the truck, Lerchenstein's glasses were knocked off. Lerchenstein fired twice in the direction of Ron Hoffman and DeSaw, striking Ron Hoffman in the chest with one of the shots and fatally wounding him. Then, DeSaw testified, Lerchenstein pointed the gun directly at him, at which point DeSaw dropped to the ground.

Ron Hoffman ran to a nearby service station where he collapsed. Lerchenstein went to the same station, where he announced that he had just been assaulted, and made a "911" emergency telephone call reporting the "assault." After the phone call, one witness testified, Lerchenstein walked over to the collapsed Ron Hoffman and said, "lay there and die, you son of a bitch." When informed later that Hoffman had died, Lerchenstein commented to an investigating police officer, "It's tough, it happened, I don't regret it."

While it was undisputed that Lerchenstein fired the shot which caused Ron Hoffman's death, the state and the appellant characterize the preceding chain of events quite differently. Under the defense theory, Michael Hoffman was struck by the truck by mistake, and Ron Hoffman was shot (and Don Hoffman and DeSaw assaulted) in perceived self-defense. The prosecution, rather, characterizes the events as an intentional overreaction by an angered Lerchenstein. There was conflict as to whether Lerchenstein knew Michael Hoffman was behind the truck. Testimony conflicted as to whether the three men running toward the truck were yelling, "stop, stop" (testimony of Don Hoffman), and "hey, you're—you're killing him, you know, he's under the truck" (testimony of DeSaw), or "hold him back, don't let him get out of here" (testimony of bystander). The defense presented testimony that one of the men struck Lerchenstein in the head before any shots were fired. Finally, whether the gun had been carried across the street by Lerchenstein that day or had been pulled out from under the seat of the truck just prior to the shooting was an issue of considerable disagreement, and an issue to which the parties and the court attached great significance.

## EVIDENCE OF PRIOR BAD ACTS

Prior to trial, the defense moved to exclude evidence concerning a dispute between Lerchenstein and his former employee, Henry Buchholz, including Buchholz' testimony that Lerchenstein had destroyed property at Buchholz' home the day before the Hoffman shooting, and evidence of three telephone conversations. The trial judge ruled that all of this evidence except one of the telephone conversations would be admitted.

The state was allowed to introduce evidence that on the day prior to the shooting, Lerchenstein damaged a stereo, television, and car stereo at Buchholz' apartment while Buchholz was not at home. The appliances were apparently "acquired" from Alert TV, and not fully paid for.

Evidence of a telephone conversation between Lerchenstein and Buchholz' landlord, occurring about 9:00 or 9:30 a.m. on the day of the shooting, was introduced. The landlord, Rand Walls, had been phoned by Lerchenstein. Walls testified that Lerchenstein shouted and cursed during the conversation, and that Lerchenstein commented, when discussing Buchholtz, "I ought to get a gun and get the SOB."

Walls said that the conversation did not involve any aggressive expressions toward him personally, and that the conversation ended on a friendly note.

Evidence of a phone conversation between Lerchenstein and Buchholz which took place at about noon on the day of the shooting was also introduced. Three witnesses testified concerning this conversation. Buchholz testified that he had phoned Lerchenstein who, after hanging up on him several times, spoke to Buchholz "very irrationally and violently and [used] quite abusive language." Buchholz testified that Lerchenstein told him "he was pissed off because he thought I'd lied to him and though I'd stolen from him ... and didn't want to see me again." Buchholz' account of the conversation included no mention of a gun or threat. Lerchenstein's employee, Scott Thomas, overheard Lerchenstein's side of the conversation and testified that while Lerchenstein's tone was angry, no threats were made, and that Lerchenstein told him, "I don't want anything else to do with you, all you've been for me is wrong, just don't come in my store anymore." Fifteen-year-old David Stone, who later witnessed the shooting, was in Alert TV at the time of this conversation. His uncle, Dan Bishop, testified that Stone, upon leaving Alert TV, excitedly told Bishop that he had heard somebody talking on the phone about killing somebody.

The prosecution was not allowed to introduce evidence of a third phone conversation in which Lerchenstein phoned his friend Dorothy Joy around midnight on the night preceding the shooting. According to the prosecution's proffer, Joy would have testified that Lerchenstein told her "he was tired of being ripped off by everybody or he'd had enough of people screwing him over," and that he had gotten angry at Joy.

Alaska Rule of Evidence 404(b) provides:

(b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■■■ The exclusionary provision of Evidence Rule 404(b) represents the "presumption in our law that the prejudicial effect of introducing a prior crime outweighs what probative value may exist with regard to propensity. No case by case balancing is permitted." *Oksoktaruk v. State*, 611 P.2d 521, 524 (Alaska 1980). When, however, a prior bad act is relevant to a material fact other than propensity, the court may admit the evidence if an Evidence Rule 403 balancing shows the evidence to be more probative than prejudicial.[2] In making this balance, the Alaska Supreme Court has cautioned that "[i]f prior crimes were found admissible whenever offered to prove a fact classified as material to the prosecution's case, 'the underlying policy of protecting the accused against unfair prejudice ... [would] evaporate through the interstices of the classification.'" *Oksoktaruk*, 611 P.2d at 524, *quoting* E. Cleary, *McCormick on Evidence* § 190, at 453 (2d ed. 1972). The trial court's inquiry, then, is two-fold. First, the court must determine

---

**2.** Alaska Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *Oksoktaruk*, the supreme court held that, when evidence of prior misconduct is involved, Evidence Rule 404(b) modifies the normal balancing process under Evidence Rule 403 by requiring the trial court to begin with the assumption that the evidence should be excluded. We recognize that Alaska Rule of Evidence 404

is based on Federal Rule of Evidence 404, and that the prevailing view under federal law is to view Evidence Rule 404 as a rule of inclusion rather than exclusion. Thus, under the federal rules, if the evidence of other misconduct is relevant for purposes other than propensity, the evidence is presumptively admissible. *See, e.g., United States v. Long,* 574 F.2d 761, 766 (3d Cir.1978). Alaska Evidence Rule 404, however, is a "rule of exclusion of evidence and not one of admission." *Oksoktaruk,* 611 P.2d at 524, *quoting United States v. Burkhart,* 458 F.2d 201, 204 (10th Cir.1972); thus the opposite presumption arises.

that the evidence sought to be admitted has relevance apart from propensity. Second, the court must determine that the nonpropensity relevance outweighs the presumed highly prejudicial impact of the evidence. *Freeman v. State*, 486 P.2d 967, 977–79 (Alaska 1971). If there is no genuine non-propensity relevance, the balancing step is never reached.

The trial court admitted the evidence as relevant to the question of whether Lerchenstein carried a gun from his store to Custom Coach in anticipation of a confrontation or pulled it from its customary storage space under the seat.[3] This factor bears on the issue of Lerchenstein's intent. It is not at all clear, however, how the evidence of the Buchholz/Walls incidents is relevant to the question of the gun's transportation unless one indulges in precisely the type of inference-making that Evidence Rule 404(b) prohibits. The jury would have to conclude that since Lerchenstein's actions and words showed a willingness to take the law into his own hands in his dispute with Buchholz, that he was likely to have acted that way with respect to Hoffman, and that it was consequently more likely that he carried the gun to the auto shop. This appears to be propensity relevance, if relevance at all. While Lerchenstein's behavior in these incidents may be generally probative of his angry and unreasonable state of mind at the time of the offense, a proper nonpropensity relevance, the relevance is highly attenuated as to the question of whether Lerchenstein was actually armed when he went to reclaim his truck. Admission of the evidence cannot be supported by this point of relevance.

The state asserts that the testimony in question was properly admitted to show that Lerchenstein was likely to react violently and unlawfully in response to those he believed were treating him unfairly, regardless of the severity of the threat to him. It cites to *Frink v. State*, 597 P.2d 154 (Alaska 1979) and *Adkinson v. State*,

611 P.2d 528 (Alaska), *cert. denied*, 449 U.S. 876, 101 S.Ct. 219–20, 66 L.Ed.2d 97 (1980), in support of the admission of the evidence.

In *Frink*, the defendant was convicted of killing his former girlfriend's lover. Along with considerable testimony about threats directed at that lover, the prosecution was allowed to introduce testimony that two years earlier the defendant had fired a gun at the same former girlfriend's then husband. The supreme court held that this evidence was properly admitted:

Evidence of prior crimes is generally inadmissible to show bad character of the accused, but is admissible if it is relevant to a material fact in the case at trial and if its probative value outweighs its prejudicial impact. *Eubanks v. State*, 516 P.2d 726, 729 (Alaska 1973). McCormick on Evidence § 190 at 447–54 (2d ed. 1972). We agree with the state that this evidence was relevant to the issue of defendant's motive for allegedly taking Hillier's [the victim] life, and also was probative of the defendant's state of mind toward Hillier. Robert Check [the ex-husband] was a member of the class of persons to which Hillier belonged, that is, persons with whom Check [the former girlfriend] was romantically involved. The determination of whether the probative value of a piece of evidence outweighs its prejudicial impact is initially committed to the discretion of the trial judge, and we review the judge's evidentiary rulings for abuse of discretion.... We find no abuse in admission of evidence relating to the [shooting] incident.

597 P.2d at 169–70 (citations and footnote omitted).

In *Adkinson*, the defendant, charged with manslaughter in the shooting of a trespasser on his property, admitted the shooting but claimed it had been accidental, asserting that he would never point a gun at another person and had never done so. 611 P.2d at 531. The supreme court held

---

**3.** Nobody saw Lerchenstein take a gun across the street with him. At trial, both prosecution and defense introduced circumstantial evidence suggesting that he did or did not take a gun with him.

that evidence of two separate incidents when Adkinson had pointed a gun at suspected trespassers on his land was properly admitted. The court in *Adkinson* found that Evidence Rule 404(b) did not bar the admission of this evidence because it was relevant to show a lack of accident or inadvertence. In doing so, it distinguished *Oksoktaruk v. State*, 611 P.2d 521 (Alaska 1980), a companion case. *Adkinson*, 611 P.2d at 532.

In *Oksoktaruk*, the defendant was arrested at 2:30 a.m. inside a photo lab. He allegedly told police he had entered to escape the cold. At his trial for burglary, the state was permitted to introduce evidence of a prior burglary committed by Oksoktaruk. *Oksoktaruk*, 611 P.2d at 523. The supreme court reversed Oksoktaruk's conviction, finding that:

> The nexus between Oksoktaruk's burglary of the fur store and his alleged burglary of the photo lab two years later does not meet the standard of relevance we have previously demanded. The only characteristic shared by the proven and alleged crimes is that both involve an intent to steal. The inference to be drawn by the jury, therefore, was simply that since Oksoktaruk once before intended to steal, he was capable of formulating the intent to steal from Kelly's Photo Lab; the forbidden "guilt by propensity" could be stated no differently.

*Id.* at 525.

In *Adkinson*, *Oksoktaruk* is distinguished by the fact that "Adkinson's prior acts are 'so related to the crime charged in point of time or circumstances that evidence thereof is significantly useful in showing the defendant's intent in connection with the crime charged.'" *Adkinson*, 611 P.2d at 532, *quoting Oksoktaruk*, 611 P.2d at 521, *quoting* 1 C. Torcia, *Wharton's Criminal Evidence* § 245, at 556 (13th ed. 1972). *See also Kugzruk v. State*, 436 P.2d 962, 966–67 (Alaska 1968) (witness's testimony identifying defendant as person she had seen fumbling to open door of apartment which she knew was not his, admissible in case where that defendant is accused of illegally entering a different apartment of the same building on the same night).

The state contends that the victims in this case and Buchholz, the target of Lerchenstein's earlier anger, were within "the same class of people ..., a class created by Lerchenstein and composed of those who he thought were out to 'screw him over' or 'rip him off.'" The trial court also found the victims and Buchholz to be of the same "class of persons," like the trespassers in *Adkinson*.

This stretches *Frink* and *Adkinson* too far. In those cases, the class was narrowly defined, and the prior actions more closely akin to the alleged actions at issue. To expand upon those cases, by finding prior acts of the nature testified to in this case outside of the exclusion of Evidence Rule 404(b), increases the danger that the rule will "evaporate through the interstices." *Oksoktaruk v. State*, 611 P.2d at 524.

The state also argues, however, that the evidence admitted is relevant to Lerchenstein's state of mind at the time of the offense. It was properly admitted, the state contends, to show Lerchenstein's explosive, overreactive mood immediately prior to the shooting. As such it helped "set the stage" for the shooting incident. *See Dulier v. State*, 511 P.2d 1058, 1061 (Alaska 1973); *McKee v. State*, 488 P.2d 1039, 1041 (Alaska 1971).

From the outset of the trial, the primary issue in this case was whether Lerchenstein was acting in self-defense when he shot Ron Hoffman. In order to establish that Lerchenstein did not act in self-defense, the state was entitled to rely on evidence indicating that, at the time of the shooting, he was angry, emotionally agitated, and extremely combative—in other words, that he was not acting reasonably. All of the challenged evidence concerning Lerchenstein's dealings with Buchholz was at least marginally probative of Lerchenstein's state of mind at the time of the offense. Since this evidence had specific relevance beyond its mere tendency to establish a propensity toward violence, its

admission was not categorically precluded by Evidence Rule 404(b).

Even if deemed relevant for a permissible purpose under Evidence Rule 404(b), however, the evidence should only have been introduced if its probative value outweighed its prejudicial impact to such an extent that the presumption favoring exclusion was overcome.[4] In evaluating the probative value of the evidence, this court may consider whether there was sufficient other evidence introduced for the same purpose. *See Fields v. State*, 629 P.2d 46, 48–52 (Alaska 1981); *Frink v. State*, 597 P.2d at 170–71.

The undisputed evidence presented at Lerchenstein's trial showed that he was of an angry, verbally aggressive state of mind during the hour preceding the shooting.[5] The probative value of the prior acts testimony as to state of mind is, then, to some extent cumulative. On the prejudice side of the balance stands the whole rationale for excluding prior bad acts generally: "it is all too likely that a determinative inference of present guilt will be drawn from the fact of the prior act, thus diluting the requirement that present guilt be proved beyond a reasonable doubt." *Oksoktaruk*, 611 P.2d at 524. "Tenuous or marginal probative value of prior crimes evidence must never be allowed to serve as an excuse for implanting prejudice in the minds of the jury." *Freeman v. State*, 486 P.2d at 979.

The incidents testified to varied in their probative value and their prejudicial impact. The unauthorized entry of Buchholz' apartment and destruction of his property on the day prior to the shooting was only marginally relevant to Lerchenstein's state of mind at the time of the shooting. It was also the most prejudicial information introduced. Testimony concerning this incident should have been excluded. Similarly, evidence of Lerchenstein's verbal threats to kill Buchholz, although occurring closer in time to the shooting, was only marginally

relevant to the reasonableness of Lerchenstein's later conduct toward the Hoffman brothers and DeSaw. Express reference to these threats was unnecessary to establish that Lerchenstein's dealings with Buchholz had placed him in a hostile and combative frame of mind. There was no evidence of any similar threats in connection with the dispute that led to Lerchenstein's conviction. Evidence of Lerchenstein's verbal threats toward Buchholz was, however, potentially highly prejudicial. This evidence literally invited the jury to conclude that Lerchenstein had a propensity toward violence, was dangerous, and therefore deserved to be convicted even if the proof in this case tended to support his claim of self-defense.

The trial court did instruct the jury to consider testimony of the telephone conversations regarding Buchholz on the morning of the shooting "only as it relates to whether or not Mr. Lerchenstein carried a gun across the street from his store to Custom Coach Auto Body when he went to pick up his truck" and not "as evidence of a propensity for threatening, violent, or assaultive behavior on the part of Mr. Lerchenstein." A limiting curative instruction is generally presumed to be effective and to cure error, *Roth v. State*, 626 P.2d 583, 585 (Alaska App.1981). However, we do not believe the instruction given here was sufficient to remove the prejudice presented by the improperly admitted evidence. By its nature, the evidence was likely to affect the jury more in their assessment of Lerchenstein's temperament than to assist them in their factual finding of how the gun arrived at the scene of the shooting. Further, the instruction did not refer to perhaps the most prejudicial of the prior acts evidence, the fact that Lerchenstein broke into Buchholz' residence and damaged property in the residence the day prior to the shooting.

While the evidence against Lerchenstein was strong, this case turned on the jury's

---

**4.** *See supra* note 2. *See also Oksoktaruk v. State*, 611 P.2d at 524; *Freeman v. State*, 486 P.2d at 979.

**5.** *See, e.g., supra* note 1.

acceptance of the prosecution's view that the actions were intentional rather than a combination of mistake and a reasonable self-defense response. The prejudicial impact of the evidence in question goes directly to that point. Despite the limiting instruction given by the court, "[w]e cannot fairly say that the ... evidence did not appreciably affect the jury's verdict against appellants." *Love v. State,* 457 P.2d 622, 632 (Alaska 1969).

■ We find that Lerchenstein is entitled to a reversal of his conviction because of the erroneous admission of evidence. If this case is retried, evidence that Lerchenstein broke into Buchholz' apartment and destroyed property, and evidence of Lerchenstein's verbal threats to kill Buchholz, should be excluded. We conclude that the trial judge did not abuse his discretion in admitting other evidence concerning Lerchenstein's angry and combative behavior immediately prior to the shooting incident. Of course, if the case is retried, the trial judge should again weigh this latter evidence and admit it only if its relevance to Lerchenstein's state of mind at the time of the charged incident outweighs the danger of prejudice. Factors which the trial judge should consider include the proximity in time to the charged incident of conversa-

tions or incidents testified to, the amount of cumulative evidence, and the likelihood that the jury will use the evidence for the proper purpose, i.e., to evaluate the defendant's mood at the time of the charged incident.

### PROPOSED JURY INSTRUCTION

Since we have decided that this case must be reversed, it is not necessary for us to reach Lerchenstein's argument that his proposed instruction on jury consideration of lesser-included offenses should have been accepted by the trial court.

This issue is before us in several other cases.[6] If Lerchenstein is retried, we expect that our decision in some of those cases will be available to give guidance to the trial court.

We also do not reach the issue of whether the sentence imposed was excessive.

**REVERSED and REMANDED.**

---

**6.** *See, e.g., Dresnek v. State,* File No. A–19, and   *Staael v. State,* File No. A–78.