STATE of Alaska, Petitioner,

v.

Adolph LERCHENSTEIN, Respondent.

No. S–954.

Supreme Court of Alaska.

Oct. 16, 1986.

Michael S. McLaughlin, David Mannheimer, Asst. Attys. Gen., Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for petitioner.

Linda Wilson, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for respondent.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON, and MOORE, JJ.

OPINION

PER CURIAM.

The opinion of the court of appeals, *Lerchenstein v. State*, 697 P.2d 312 (Alaska App.1985), is affirmed for the reasons expressed therein.

RABINOWITZ, Chief Justice, with whom BURKE, Justice, joins, dissenting.

Adolph Lerchenstein was charged with three counts of assault in the third degree and one count of murder in the first degree. Following a jury trial, Lerchenstein was convicted on all four counts and sentenced to serve four years on one count of assault, three years on each of the other two assault counts, and sixty years on the murder count, all to run concurrently. The court of appeals reversed his convictions on the ground that certain evidence of prior bad acts should have been excluded. *Lerchenstein v. State*, 697 P.2d 312 (Alaska App.1985). I would reverse the court of appeals and affirm the four convictions.

FACTS

On May 17, 1982, at approximately 1:00 p.m., Adolph Lerchenstein, owner of Alert TV, phoned Custom Coach Auto Body, which was located across the street from Alert TV.[1] He spoke with Michael Hoffman, a co-owner of the auto repair shop. Lerchenstein called to inquire about the progress of an estimate for repair work on his truck which he had left at Custom Coach a week earlier. When Hoffman informed Lerchenstein that the estimate was not ready, an argument ensued in which, according to Hoffman and not disputed by other evidence, Lerchenstein became extremely angry, and in a rash tone cursed Hoffman and made disparaging remarks about his business. Hoffman requested that Lerchenstein come get his truck.[2]

1. The statement of facts in this opinion is taken substantially from the court of appeals' opinion.

2. On direct examination Michael Hoffman gave this account of the phone conversation:
    Q. And tell us about the conversation.
    A. Okay. He just—he called me up and he wanted to know if I had his estimate completed, and I explained to him that I didn't have it done yet, but I was still working on it and for some reason, he just started getting real rude and abrupt with me.
    Q. What do you mean by that?
    A. Well, he just started ranking on my business and asked me if I was running a shoe-string operation or something like that and I replied, you know, that I'm working on his estimate as much as I can and, you know,
    maybe it'd be another day or so before I could get it done.
    Q. How did he react to that?
    A. He didn't like it. He flew off and said something about you assholes or something like that, and then finally I told him, I says, well, Adolph, I says, if that's the way you feel about it, why don't you just come and get your truck, and, you know, no problem, you just go ahead and come over and pick it up and, you know, and go ahead and take it somewhere else, matter of fact, I prefer you do that.
    Q. And he said?
    A. He just said well, okay, you butt fucker, if that's the way you want it, and then he hung up. [697 P.2d at 313 n. 1]

Lerchenstein sent an employee across the street to Custom Coach to retrieve the truck. When the employee arrived, Hoffman told him that a thirty-five dollar storage fee would be charged on the truck. Hoffman testified that he decided to charge this fee, which he did not customarily collect, because he was angry about Lerchenstein's comments to him on the phone. The employee returned to Alert TV.

A short time later, Lerchenstein crossed the street and entered his truck. Michael Hoffman approached the window of the truck with a bill and told Lerchenstein that he owed the storage fee. At this point, Hoffman testified, Lerchenstein "started acting real erratical.... [H]e was inside the truck and he just started jumping up and down...." Hoffman testified he told Lerchenstein that he was going to call the police, and then walked down the side of and behind the truck.

At this point the particular events giving rise to the charges occurred. Lerchenstein drove his truck in reverse (there was a large sand pile in front of the truck), striking Michael Hoffman and dragging him beneath the vehicle as Hoffman held on to the bumper. Lerchenstein stopped travelling in reverse and apparently began to shift to drive. The truck stalled. Around this time Don Hoffman, Ron Hoffman, and Lance DeSaw ran towards Lerchenstein's truck. Michael Hoffman's brother, Don Hoffman, reached the truck on the passenger's side. Don Hoffman testified that he opened the door of the cab and climbed partly onto the front seat of the truck. He then noticed a handgun on the seat. Lerchenstein picked up the gun and pointed it in Don Hoffman's direction, but did not fire. Don Hoffman slid out of the truck. At about the same time another Hoffman brother, Ron, reached the driver's side of the truck, along with DeSaw, co-owner of Custom Coach. Both reached in through the window on the driver's side. Ron Hoffman had a cast on his wrist at the time. At some point after Don Hoffman slid out of the truck, Lerchenstein's glasses were knocked off. Lerchenstein fired twice in the direction of Ron Hoffman and DeSaw,

striking Ron Hoffman in the chest with one of the shots and fatally wounding him. Then, DeSaw testified, Lerchenstein pointed the gun directly at him, at which point DeSaw dropped to the ground.

Ron Hoffman ran to a nearby service station where he collapsed. Lerchenstein went to the same station, where he announced that he had just been assaulted, and made a "911" emergency telephone call reporting the "assault." After the phone call, one witness testified, Lerchenstein walked over to the collapsed Ron Hoffman and said, "lay there and die, you son of a bitch." When informed later that Hoffman had died, Lerchenstein commented to an investigating police officer, "It's tough, it happened, I don't regret it."

While it was undisputed that Lerchenstein fired the shot that caused Ron Hoffman's death, at trial the state and the defendant characterized the preceding chain of events differently. Under the defense theory, Lerchenstein struck Michael Hoffman with the truck by mistake and shot Ron Hoffman (and assaulted Don Hoffman and DeSaw) in perceived self-defense. The state characterized the events as an intentional action by an angered Lerchenstein. There was conflicting evidence as to whether Lerchenstein knew Michael Hoffman was behind the truck. Testimony also conflicted as to whether the three men running toward the truck were yelling, "stop, stop" (testimony of Don Hoffman), and "hey, you're—you're killing him, you know, he's under the truck" (testimony of DeSaw), or "hold him back, don't let him get out of here" (testimony of bystander). The defense presented testimony that one of the men struck Lerchenstein in the head before any shots were fired. Finally, whether the gun had been carried across the street by Lerchenstein that day or had been pulled out from under the seat of the truck just prior to the shooting was an issue of fact about which there was considerable disagreement.

## EVIDENCE OF PRIOR BAD ACTS

To rebut Lerchenstein's claim of self-defense, the prosecution sought to introduce

evidence that Lerchenstein was in an irrational, violently angry mood the morning of the shooting and that he was particularly prone to lash out at those whom he perceived to be "ripping him off." The state's offer of proof consisted of the testimony of Henry Buchholz, Lerchenstein's former employee; Rand Walls, Buchholz's landlord; and Dorothy Joy, Lerchenstein's business neighbor. Each of these witnesses had had a confrontation with Lerchenstein in the twelve hours preceding the shooting, and each characterized Lerchenstein's conduct as irrational and upset.

Lerchenstein's confrontation with Buchholz ended only one hour before the shooting. The day before the shooting Lerchenstein had gone to Buchholz's apartment when he was not there and had damaged his television, a stereo system, as well as a tape player in Buchholz's car. Buchholz apparently had acquired these items from Alert TV but had not fully paid for them. The morning of the shooting, Buchholz called Lerchenstein. Buchholz testified that Lerchenstein, after hanging up on Buchholz several times, spoke to him "very irrationally and violently and [used] quite abusive language." Buchholz testified that Lerchenstein told him "he was pissed off because he thought I'd lied to him and thought I'd stolen from him ... and didn't want to see me again." Buchholz's account of the conversation included no mention of a gun or threat. Lerchenstein's employee, Scott Thomas, overheard Lerchenstein's side of the conversation and testified that while Lerchenstein's tone was angry, no threats were made. He further testified that Lerchenstein told Buchholz, "I don't want anything else to do with you, all you've been for me is wrong, just don't come in my store anymore." Fifteen-year-old David Stone, who later witnessed the shooting, was in Alert TV at the time of this conversation. His uncle, Dan Bishop,

testified that Stone, upon leaving Alert TV, excitedly told Bishop that he had heard somebody talking on the phone about killing somebody.

At trial the state also introduced evidence of a telephone conversation between Lerchenstein and Buchholz's landlord, Rand Walls. Lerchenstein phoned Walls at about 9:00 or 9:30 a.m. on the day of the shooting. Walls testified that Lerchenstein shouted and cursed during the conversation, and that Lerchenstein commented about Buchholz, "I ought to get a gun and get the SOB." Walls said that the conversation did not involve any aggressive expressions toward him personally, and that the conversation ended on a friendly note.[3]

The state argued that the evidence of Lerchenstein's angry, violent reactions to those he believed were taking advantage of him explained his violent, irrational reaction when he learned that Michael Hoffman was charging him a $35 storage fee for an uncompleted estimate. In the state's view this evidence was relevant to the issue of whether Lerchenstein had taken the pistol to the body shop expecting a confrontation as well as relevant to the issue of whether Lerchenstein honestly and reasonably believed that deadly force was necessary to save himself from death or serious physical injury.

Lerchenstein's position was that the evidence was inadmissible because it was not offered for a permissible purpose. The defense further contended that Lerchenstein had had a "cooling down period" between his last conversation with Buchholz at noon and his telephone conversation with Michael Hoffman concerning the truck at 1:30 p.m.

The superior court ruled that the evidence of Lerchenstein's conversations with Buchholz and Walls was admissible, but

---

3. The superior court did not allow the State to introduce evidence of a third conversation that occurred when Lerchenstein telephoned his friend Dorothy Joy at about midnight the night before the shooting. According to the prosecution's proffer, Joy would have testified that Lerchenstein told her "he was tired of being ripped off by everybody or he'd had enough of people screwing him over," and that he had gotten angry at Joy. She would have also testified that Lerchenstein's anger upset her so much that she did not go to her business the day of the shooting because she feared seeing him.

that the evidence of Lerchenstein's conversation with Joy should be excluded. The superior court also admitted testimony that Lerchenstein had damaged property in Buchholz' apartment. On appeal, the court of appeals reversed Lerchenstein's convictions, holding that the evidence of prior bad acts, although relevant to Lerchenstein's state of mind, was inadmissible since its probative value did not outweigh its prejudicial impact. 697 P.2d at 317-19.

Alaska Rule of Evidence 404(b) states:

*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The determination of whether prior bad acts evidence is admissible involves a two step analysis. First, the court must determine whether the evidence sought to be admitted has relevance apart from propensity under Evidence Rule 404(b); second, it must determine that the probative value of the evidence outweighs its prejudicial impact under Evidence Rule 403.[4] *Fields v. State*, 629 P.2d 46, 49 (Alaska 1981).

Although at trial the state never clearly articulated the purpose for which it offered the questioned evidence, in essence the offer was to establish Lerchenstein's motive in shooting Ron Hoffman and in pointing the gun at Don Hoffman and Lance De-Saw. The state sought to introduce this evidence to demonstrate Lerchenstein's intense personal hostility toward those he perceived were taking advantage of him. *See* 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404[14], at 404-108, 109 (1985). (Evidence of other crimes has been admitted to show the likelihood of defendant having committed the charged crime because he was filled with hostility.)[5]

The state argued that the prior bad acts were relevant to whether Lerchenstein had the gun with him when he crossed the street to go to the body shop and to Lerchenstein's state of mind at the time of the shooting. [697 P.2d at 316, 317] The superior court focused on the first issue, but both issues essentially are factors in determining Lerchenstein's motive.[6] Motive was fiercely disputed, and was material to the case because Lerchenstein claimed that he acted in self-defense.[7]

Since the evidence offered was relevant to Lerchenstein's motive in connection with the shooting and the assaults, the question then becomes whether its probative value outweighs its prejudicial impact under Rule 403. Admission of evidence of prior bad acts is by its nature highly prejudicial and the outcome must be subject to careful scrutiny. *Coleman v. State*, 621 P.2d 869, 874 (Alaska 1980), *cert. denied*, 454 U.S. 1090, 102 S.Ct. 653, 70 L.Ed.2d 628 (1981). In *Lerchenstein*, the court of appeals analyzed the probity versus prejudice balance in a Rule 404(b) context as follows:

In *Oksoktaruk*, the supreme court held that, when evidence of prior misconduct is involved, Evidence Rule 404(b) modifies the normal balancing process

---

4.  Alaska R.Evid. 403 provides:

    Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5.  In making the offer of proof, the prosecutor stated:

    It's a heck of a lot different case if a gun happens to be underneath and he grabs for it in self-defense as three people are coming at him versus walking across the street, being in a bad mood, consciously taking a gun.

6.  Intent was not a material issue, since Lerchenstein did not contend that the shooting was accidental.

7.  In *Wakaksan v. United States*, 367 F.2d 639 (8th Cir.1966), *cert. denied*, 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967), a prior conviction of assault and battery against decedent was admitted where defendant claimed self-defense against charges of voluntary manslaughter. The court stated: "By arguing self defense the appellant's possible motives and mental attitude toward the victim become especially important." *Id.* at 645-46.

under Evidence Rule 403 by requiring the trial court to begin with the assumption that the evidence should be excluded.

697 P.2d at 315 n. 2.

Later in the opinion, the court of appeals elaborated:

> Even if deemed relevant for a permissible purpose under Evidence Rule 404(b), however, the evidence should only have been introduced if its probative value outweighed its prejudicial impact to such an extent that the presumption favoring exclusion was overcome.

697 P.2d at 318.

The presumption against admissibility explained in *Oksoktaruk v. State*, 611 P.2d 521, 524 (Alaska 1980), is applicable to the first step of the Rule 404(b) analysis (whether the evidence has any relevance apart from propensity), not to the second (whether probative value outweighs its prejudicial impact), as the court of appeals stated above. In *Oksoktaruk*, we noted:

> [E]ven though a prior crime may show a propensity on the part of a defendant to commit crimes, which in turn is relevant to the question of present guilt, it is a presumption in our law that the prejudicial effect of introducing a prior crime outweighs what probative value may exist *with regard to propensity*. No case by case balancing is permitted; a prior crime may not be admitted to show propensity.

611 P.2d at 524 (emphasis added).

In my view *Oksoktaruk* stands for the proposition that there is an irrebuttable presumption that the prejudicial effect outweighs the probative value of evidence offered to show propensity. It was not intended that this presumption affect the second step of the Rule 404(b) analysis, the Rule 403 balancing of prejudicial impact and probative value of prior bad acts evidence introduced to prove a material fact other than propensity.[8]

I now turn to whether the superior court erred in determining that the probative value of the prior bad acts evidence outweighed its prejudicial impact. This court will reverse the trial court's resolution of this issue only upon a showing of a clear abuse of discretion. *Ladd v. State*, 568 P.2d 960, 968 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *Newsom v. State*, 533 P.2d 904, 908 (Alaska 1975). In the case at bar I would hold that the superior court did not abuse its discretion in admitting the prior bad acts evidence which was relevant to Lerchenstein's motive in pointing his gun at the body shop employees and in shooting Ron Hoffman.

Lerchenstein's motive was a material issue, and the state had substantial need for the prior bad acts evidence. Need is an important consideration, because it is the incremental probity of the evidence that must be balanced against its potential for undue prejudice. *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Therefore, if the government has a strong case on the disputed issue, the evidence of a prior bad act may add little and consequently will be excluded more readily. *Id.*

Here the state needed to demonstrate Lerchenstein's intense hostility toward people he perceived as "ripping him off" in order to rebut his claim of self-defense. There was very little evidence to support the state's position other than the testimo-

---

8. I also disagree with the court of appeals' implication that the fact that Alaska R.Evid. 404 is a "rule of exclusion" is a ground for a modified balancing process. *Lerchenstein*, 697 P.2d at 315 n. 2. Whether the courts of a particular jurisdiction consider the rule to be one of inclusion or exclusion again bears on the first step of the Rule 404(b) analysis, not the second.

In federal practice, Rule 404(b) is an "inclusionary" rule, which admits all evidence of other crimes relevant to an issue in trial, except that which tends to prove only criminal disposition. 2 J. Weinstein & M. Berger, *supra* § 404[08], at 404-54, 55. Under the "exclusionary" rule prevailing in most other jurisdictions, all other crimes evidence is excluded unless it is relevant to specified facts and propositions, such as identity, motive, common scheme or plan, and knowledge. *Id.*

ny about Lerchenstein's actions in Buchholz' apartment and about the content of the questioned telephone conversations which took place on the same day as the shooting. The state did produce independent evidence suggesting that Lerchenstein carried the gun across the street, which contradicted his testimony and also tended to rebut his claim of self-defense. Without the questioned evidence however, this evidence did not establish Lerchenstein's motive. I therefore conclude that the prior bad acts evidence was highly probative of a material issue in the case.

*Adkinson v. State,* 611 P.2d 528 (Alaska 1980), lends support for this conclusion. Adkinson was convicted of manslaughter after a confrontation with trespassers on his land. The deceased's two companions testified that Adkinson was upset as he approached them, that Adkinson was belligerent, and that Adkinson pointed his gun directly at the deceased moments before it discharged. Adkinson testified that the weapon was pointed "to the side of" the deceased and that the deceased was in an agitated state and attempted to grab the weapon from Adkinson's hands, thereby pulling it towards himself when it discharged. On rebuttal, the prosecution offered the testimony of two witnesses who described two separate incidents when Adkinson pointed a gun at suspected trespassers on his land.

Adkinson argued on appeal to this court that the admission of evidence of purported prior similar acts toward trespassers was error because it was character evidence prohibited by Evidence Rule 404(b). Adkinson contended that the introduction of the evidence was for the purpose of portraying him as a person with a predisposition to commit that sort of crime. In upholding the admission of the evidence this court stated:

> However, it is equally well-established that where the evidence of prior crimes or acts is relevant to a material fact in the case at trial, it does not fall within the prohibition. This court has admitted evidence of other crimes, wrongs, or acts

where it has been offered to prove motive, intent, identity or has "set the stage" for the crime being tried.

. . . .

> The trial judge ruled that this evidence regarding prior confrontations between Adkinson and trespassers was relevant to show that Adkinson's pointing of his shotgun at Butts was not accidental or inadvertent. We agree with this determination. Here, unlike the situation presented in *Oksoktaruk v. State,* 611 P.2d 521 (Alaska 1980) and *Eubanks v. State,* 516 P.2d 726, 729 (Alaska 1973), Adkinson's prior acts are "so related to the crime charged in point of time or circumstances that evidence thereof is significantly useful in showing the defendant's intent in connection with the crime charged." However, this does not end the inquiry. As we stated in *Eubanks v. State,* 516 P.2d 726, 729 (Alaska 1973), "[e]ven when such evidence is relevant, the probative value must outweigh its prejudicial impact." This is a question which is left to the trial court's discretion, and reversal is required only where it is found that the trial court has abused that discretion.

> It cannot be denied that the testimony by Banks and Blessington was highly damaging to the defense. The evidence was probative of a material fact in this case, *i.e.,* whether Adkinson intentionally pointed his gun at Butts. The testimony itself was clear and convincing. It rendered Adkinson's version of the incident much less believable in a case which largely turned upon his credibility and that of the other witnesses. While there is always a danger of jury misuse of this sort of evidence, in this case the evidence was not of the type to arouse the jury to "overmastering hostility." We cannot find that the trial court abused its discretion in admitting the evidence.

611 P.2d at 531, 532.

Prior bad acts evidence is always prejudicial. The risk of prejudice increases where the previous offense is similar to the offense for which the accused is presently

**552**

on trial. *See United States v. Lavelle,* 751 F.2d 1266, 1278 (D.C.Cir.) *cert. denied,* —— U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). The evidence of prior bad acts in this case is not totally dissimilar to the charged offense, but its similarity is not such that its prejudicial impact outweighs its probative value. The evidence indicated that Lerchenstein was so angered at Buchholz for failing to fully pay for the appliances from his store that he went to Buchholz's apartment and damaged them. While this evidence is prejudicial in its suggestion that Lerchenstein is a violent person, the implication is weakened by the vast difference between the act of damaging a stereo and the act of shooting a person. Lerchenstein's behavior during the two telephone conversations is less prejudicial because it consisted only of words, not acts. Buchholz testified that Lerchenstein spoke to him "very irrationally and violently and [used] quite abusive language," and that he said "he was pissed off because he thought I'd lied to him and thought I'd stolen from him ... and didn't want to see me again." Walls testified that Lerchenstein commented, when discussing Buchholz, "I ought to get a gun and get the SOB." The prejudicial impact of this statement is also lessened by the fact that it was an angry threat, not an act. All this evidence was prejudicial to Lerchenstein, but not so prejudicial as to outweigh its value in proving his irrational, enraged state of mind when confronted with the perception that someone was seeking to take advantage of him. Therefore, I would hold that the superior court did not abuse its discretion in admitting the prior bad acts evidence.