**Robert BETTS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2050.**

Court of Appeals of Alaska.

Sept. 28, 1990.

**326**

William F. Dewey, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, for appellant.

W.H. Hawley, Assistant Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., COATS, J., and CUTLER, Superior Court Judge.[*]

COATS, Judge.

Robert Betts was convicted, following a jury trial, of murder in the first degree. AS 11.41.100(a)(1). Betts appeals to this court, attacking his conviction on several grounds. We affirm.

For the most part, the underlying facts of this case are not in dispute. Robert Pfeil, a pilot for Alaska Airlines, was shot in his car while he was stopped at an intersection on October 12, 1985. A yellow Lincoln Continental pulled up beside him, and John Bright opened fire on Pfeil with a .45 caliber pistol. Pfeil was seriously wounded and eventually died of his injuries. The driver of the Lincoln Continental was nineteen-year-old Robert Betts. Pfeil was the brother-in-law of Neil MacKay, an Anchorage attorney and real estate developer who had since moved to Hawaii. MacKay's

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

wife, Muriel Pfeil, had been killed in a car bombing in 1975, and Pfeil suspected that MacKay was responsible for her death. Pfeil was also the trustee of assets for MacKay's son which had come from Muriel Pfeil, an additional cause for tension between the two men.

The state's theory of the case was that MacKay paid $10,000 to Gilbert Pauole to arrange for the shooting.[1] Pauole, who apparently had ties with a Seattle-based crime organization, operated two strip bars in Anchorage, including the "Wild Cherry" which was in a building owned by MacKay. Pauole, in turn, approached Larry Gentry and John Bright, two former employees with whom Pauole had also dealt cocaine. According to Pauole, who made an agreement with the state to plead guilty to attempted first-degree murder and to testify for the state, Bright was a violent man who described himself as a "sidewalk commando."

Bright sought the assistance of Robert Betts. According to Betts' statements to the police, Bright told him that Pfeil was the target of a "union scare job." Bright staked out Pfeil's home and was joined once or twice by Betts. The two men wanted to identify Pfeil's car and, at some point, Bright apparently considered murdering Pfeil at his home.

Betts obtained use of a .45 caliber pistol for $75 from Tyoga Closson. Closson had stolen the gun from the residence of a local attorney where Closson's girlfriend was babysitting. Bright and Betts then borrowed Gentry's Lincoln Continental. Betts' defense at trial was that he thought Bright planned only to shoot out the tires of Pfeil's car. However, when Betts pulled up along side of Pfeil's car, Bright shot Pfeil several times before Betts sped away.

The police investigation began to center around Betts and Closson; both had apparently told friends about their roles in the murder. Betts allegedly told one friend that he had been the trigger man himself. Police eventually recovered the gun which Betts had returned to Closson and Closson had traded to another man for cocaine.

The police agreed to grant Closson immunity for his cooperation in the investigation, and Closson subsequently engaged in a number of surreptitiously monitored conversations with Betts.

Closson eventually revealed to Betts that he was cooperating with the police and suggested that the state might be "willing to make a deal with the driver." At the same time, Betts was aware that he might be in physical danger from Bright. Betts came into the Anchorage Police Department. Police investigators told Betts that he was not under arrest but also emphasized that they already had ample evidence to prosecute him for his role in the murder. Betts then made an extensive statement, describing his role in the events leading to the Pfeil murder. Betts also agreed to wear a wire and attempt to talk with Bright. Bright could not be located, however, although Betts did engage in a monitored conversation with Gentry.

■ In a pretrial motion, Betts contended that the state offered him immunity in return for his cooperation in the investigation of the murder of Robert Pfeil. Following an extensive evidentiary hearing, Superior Court Judge Mary E. Greene issued written findings that Betts was not expressly or impliedly offered immunity and that Betts had not acted in reasonable reliance on a promise by the state's agents for immunity when he cooperated with the police. Betts argues that Judge Greene's findings were clearly erroneous.

We discussed the law which applies to immunity agreements in *Closson v. State*, 784 P.2d 661, 664–65 (Alaska App.1989) (citations omitted):

> Immunity agreements are contractual in nature and general principles of contract law apply to the resolution of disputes concerning their enforcement and breach. In such cases, "[t]he law of contracts presents an apt model to guide and inform ... analysis."
>
> There is nevertheless widespread recognition that cases involving immunity agreements cannot always be decided by

---

1. MacKay was charged, tried, and acquitted on charges that he arranged for the murder.

mechanical application of contract law. Although the analogy between immunity agreements and ordinary contracts is useful, immunity agreements are subject to constitutional restraints, foremost of which is the due process clause's over-riding guarantee of fundamental fairness to the accused.

. . . .

In keeping with general principles governing appellate review of contracts claims, a trial court's findings on the terms and scope of an immunity agreement and on the issue of breach must be upheld unless clearly erroneous.

We have reviewed the evidence in this case and conclude that the superior court did not err in finding, that Betts was not protected by an immunity agreement with the state. The record supports Judge Greene's finding that Betts contacted the police voluntarily when he recognized that the police had substantial information that he was the driver of the car which was involved in the murder of Robert Pfeil. Betts contacted the police at the urgings of Closson, who was working with the police. Betts had Closson telephone the police, and Closson talked to Investigator Joseph Austin of the Anchorage Police Department. Closson, purporting to speak for Austin, told Betts that the police could not make any deals, but that the district attorney had that authority and that the district attorney was "willing to work with the driver and make him a deal." Closson told Betts that Austin indicated the driver was going to have to tell the police what he knew before anyone made any deal. Closson relayed Austin's assurance that the police would not arrest them if they went to the station. Betts and Closson then went to the police station, and Betts gave a full statement to the police admitting his involvement in the Pfeil shooting but indicating that he thought that Bright was just going to scare Pfeil, not murder him.

Judge Greene concluded that although Betts believed that the district attorney would probably enter into an agreement with him, he was not told what the agreement would be nor was he given any assurances that an agreement would in fact be offered. In making her decision, Judge Greene pointed to the direct statement which was made by Assistant District Attorney Steve Branchflower where he specifically addressed Betts and stated: "The point I want to make sure you understand, Robert, is that there are no deals."

■ Judge Greene found that Betts agreed to cooperate with the authorities despite his understanding that the authorities were not offering him a deal other than to make sure that his cooperation was recognized. We have reviewed the record and conclude that these findings are not clearly erroneous. We accordingly affirm Judge Greene's finding that Betts was not offered immunity by the state.[2]

■ Betts next contends that Judge Greene erred in not allowing the jury to decide as a factual matter whether the state had offered Betts immunity. In *Closson*, 784 P.2d at 667 n. 1, we decided that the court, not the jury, should decide questions relating to a defendant's immunity from prosecution based on an agreement with the state. We adhere to that holding in this case. *See also United States v. Gonzales–Sanchez*, 825 F.2d 572, 578 (1st Cir.1987), *cert. denied sub nom. Latorre v. United States*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). Betts appears to contend that the court precluded him from fully exploring the credibility of the police officers by its ruling that the questions involving the existence and scope of a purported immunity agreement were questions for the court. From our review of the record, it seems clear that Betts was able to fully argue the evidence concerning the alleged immunity agreement insofar as it affected the credibility of the police officers and the assistant district attorney.

**2.** Betts alternatively offers an "estoppel" theory, essentially claiming that his cooperation in the subsequent police investigation implies that he was under a grant of immunity. However, we do not agree that this implication necessarily follows. *See United States v. Schmidt,* 760 F.2d 828, 836 (7th Cir.1985), *cert. denied,* 474 U.S. 827, 106 S.Ct. 86, 88 L.Ed.2d 71 (1985).

■ Betts also argues that the jury instruction which Judge Greene gave concerning the immunity agreement was erroneous. Judge Greene gave the following instruction:

The question of whether Robert Betts had an immunity agreement with the State is one that is reserved solely for the court and is not for the jury to determine.

The circumstances surrounding Mr. Betts' statement to the police may be relevant to show the context of the statement and may be relevant to your determination of credibility and state of mind.

We do not believe that this instruction improperly influenced the jury. The instruction is merely a correct statement of the law. We find no error.

■ Betts next contends that the trial court erred in failing to suppress the statements which he made to the police concerning the offense. Betts argues that the statement which he made to the police on October 26, when he first went to the police station, violated his due process rights and his right to counsel. He also contends that his statement was involuntary and was made in violation of his right against self-incrimination. Judge Greene found that Betts' statement was voluntary and that Betts was not in custody at the time that he made the statements. Judge Greene made extensive findings which are supported by the record. *See State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987). She essentially found that Betts went to the police station voluntarily, hoping to make a deal with police. The police assured him that they would not arrest him at that time and that he was free to go at any time. Judge Greene concluded that Betts was not in custody and the police were therefore not obligated to give him *Miranda* warnings. We find no error. *See Thompson v. State*, 768 P.2d 127, 130–31 (Alaska App. 1989).

■ Betts next contends that Judge Greene erred in not dismissing the indictment against him. One of Betts' major contentions is that the prosecutor should have presented evidence of the purported immunity agreement to the grand jury. We have already indicated that questions concerning the existence and scope of an immunity agreement are for the court. The prosecutor was not required to present these issues to the grand jury. Betts also argues that the prosecutor erred in presenting his inculpatory statement to the grand jury. Essentially, he again raises the argument that the court erred in failing to suppress the statement which Betts made to the police. We have formerly rejected this contention. Betts argues that the prosecutor should have presented the actual tape recordings of Betts' conversations with Closson to the grand jury. Instead, the state had Officer Grimes summarize what Betts told Closson on the tapes. However, as the state points out, this argument was not raised in the trial court. We therefore decline to decide this issue for the first time on appeal since there is no showing of plain error. *Gaona v. State*, 630 P.2d 534, 536–37 (Alaska App.1981); [3] *see* Alaska R.Crim.P. 6(r) (witness may summarize evidence before grand jury in appropriate cases).

■ Betts next argues that Judge Greene erred in failing to dismiss the indictment because the prosecutor presented statements by accomplice codefendants without showing any justification for presenting those statements on the record. *See* Alaska R.Crim.P. 6(r)(1). In the trial court, Judge Greene agreed that the prosecution did not properly introduce the hearsay statements. Judge Greene concluded that, although the prosecution may normally assume that codefendants will exercise their fifth amendment right to not testify, the prosecutor is required under the rules to make a record supporting the justification for the use of hearsay statements. *See Galauska v. State*, 527 P.2d 459, 463–66 (Alaska 1974), *modified on other grounds*, 532 P.2d 1017 (Alaska 1975). However, Judge Greene evaluated the evidence presented to the grand jury without reference to the hearsay statements of

**3.** We reject Betts' claim of governmental mis-    conduct for the same reasons.

Betts' codefendants and determined that there was sufficient independent evidence to support each and every element of the indictment against Betts. We agree with Judge Greene that, even if the codefendant's statements were improperly admitted, the remaining evidence against Betts is sufficient to support the indictment. *Newman v. State*, 655 P.2d 1302, 1306 (Alaska App.1982). We accordingly affirm Judge Greene's decision refusing to dismiss the indictment.

Betts next argues that Judge Greene erred in admitting evidence of prior bad acts of his codefendants in the Pfeil murder. In his opening statement, the prosecutor in this case gave extensive background information concerning MacKay, Pauole, Gentry, and Bright. The prosecutor told the jury that Pauole had a criminal record and had gone to work running a bar in Anchorage called the "Wild Cherry," which was a strip bar. He stated that Pauole worked for an organized crime group which was based in Seattle. The prosecutor told the jury that Pauole was to participate in tax fraud as part of his duties. The prosecutor discussed the relationship between Pauole and MacKay. MacKay was Pauole's landlord at the Wild Cherry. Apparently MacKay gave Pauole business advice, and Pauole gave MacKay VIP treatment when he came into the bars, including paying some of the Wild Cherry's dancers to have sex with MacKay. The prosecution discussed the allegation that MacKay had arranged to have his former wife murdered and that MacKay had arranged for the murder of Robert Pfeil.

The prosecutor indicated that Bright was a violent man who loved to talk about violence and flaunt guns. The prosecutor also represented that Bright, and his roommate, Gentry, had sold drugs for Pauole. However, at some point, Gentry eventually owed Pauole approximately $3,000, which was a drug debt. The prosecutor presented this narrative as background information supporting the state's theory of the case. Later the prosecutor presented evidence of this background.

In his opening statement, and throughout the case, the prosecutor indicated that the only one of these people whom Robert Betts knew was John Bright. As the state points out, Betts did not object to the opening statement and to much of the testimony about which he now complains. However, Betts did clearly object to much of the testimony which involved prior bad acts of John Bright.

■ As Betts points out, Alaska law greatly restricts the admission of prior bad acts against a defendant. *Lerchenstein v. State*, 697 P.2d 312 (Alaska App.1985), *aff'd*, 726 P.2d 546 (Alaska 1986). *See* A.R.E. 403, 404(b). Here we are addressing a witness's bad acts rather than a defendant's, but the principles are similar. In *Lerchenstein*, we directed the trial courts to engage in a two-step analysis in deciding whether to admit such testimony:

> First, the court must determine that the evidence sought to be admitted has relevance apart from propensity. Second, the court must determine that the non-propensity relevance outweighs the presumed highly prejudicial impact of the evidence. If there is no genuine nonpropensity relevance, the balancing step is never reached.

697 P.2d at 315–16 (citation omitted). We review the trial court's ruling for abuse of discretion. *Id.* at 319.

None of the evidence of which Betts complains was admitted for a propensity purpose. All of the evidence was admissible as background information to show the interrelationships between the parties. This evidence does not appear unduly prejudicial. *See Dulier v. State*, 511 P.2d 1058 (Alaska 1973); *McKee v. State*, 488 P.2d 1039 (Alaska 1971); *Ciervo v. State*, 756 P.2d 907 (Alaska App.1988). First, as noted, none of the prior bad acts were prior bad acts of Betts. *See Garner v. State*, 711 P.2d 1191, 1195 n. 3 (Alaska App.1986). Second, as the prosecutor conceded in his opening statement and the evidence showed at trial, Betts did not know any of the other codefendants involved in this case whose prior bad acts are in question, except for Bright. Under these circum-

stances, the prejudice to Betts seems attenuated. Many of the prior bad acts involved Pauole, one of the state's key witnesses. The state had no reason to unnecessarily undermine Pauole's credibility.

The key issue concerning the prior bad acts of Betts' codefendants concerns the admission of testimony concerning the prior bad acts of John Bright. Bright was a person whom Betts knew, and Betts clearly objected to the admission of testimony concerning Bright's bad acts.

Pauole testified about Bright. He stated, "Bright had projected this image to me that he was a sidewalk commando, that he could handle any problem that would come his way. He always played a very macho person. He was a street person. He never showed me that he was afraid of anybody. He told me stories of where he had taken a mop ringer to somebody's head that bothered him. He always had knives, guns on him. And he was somebody that showed me that he could handle any problem that came his way." Over objection, Pauole testified that Bright told him about being involved in a shoot out with one of his neighbors at the Woodland Park Apartments.

Brenda Pate, who knew both Betts and Bright, also testified at trial. Pate testified that Bright told her, "that ... he would like to kill people" and that she believed him. Pate also testified that Bright had shot at a neighbor at the Woodland Park Apartments. Pate also testified that she had observed Bright and Betts together, and that on one occasion, Bright had indicated that he and Betts were friends. Finally, Pate indicated that Bright told her that he had been in prison for stealing cars.

At trial, Betts' defense was that, although he had driven the car that was involved in the murder of Robert Pfeil, he had not known that Bright intended to murder Pfeil. In his statements to the police, he thought that Bright was merely going to frighten Pfeil. In order to combat this theory, the prosecutor presented the evidence in question to support his theory that Betts knew that Bright was an extremely violent person and that this knowledge, coupled with other information, supported the inference that Betts knew that Bright intended to kill Pfeil. *See Mossberg v. State,* 624 P.2d 796, 802 (Alaska 1981); *Braham v. State,* 571 P.2d 631, 641 (Alaska 1977), *cert. denied,* 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978); *Cole v. State,* 754 P.2d 752, 755–56 (Alaska App. 1988).

We believe that Judge Greene could properly determine that the evidence concerning Bright's actions and statements which indicated that he was a violent person was properly admitted for a nonhearsay purpose: to show Betts' knowledge of Bright's history of violence. There was abundant evidence to establish that Betts was aware of most of the violent actions and statements attributed to Bright.[4] This evidence went to the major issue in the case: whether Betts knew that Bright intended to kill Pfeil. The evidence was therefore properly admitted for a nonpropensity purpose.[5]

The next question is whether the probative value of the evidence outweighed the danger of unfair prejudice. We believe that Judge Greene could properly conclude that it did. The evidence presented at trial showed that Bright and Betts were friends and that Betts was frequently with Bright. The evidence also showed that Bright fre-

---

**4.** Melody Markley, who was Betts' girlfriend, testified that she had been present when Bright told Betts about his involvement in a shootout at the Woodland Parks Apartment. Additionally, Markley had heard Bright and Betts discussing guns. Betts' own statement to police, which was introduced into evidence, also showed that he was aware of Bright's involvement in the shootout, as well as of Bright's participation in another shooting at a liquor store. Betts' statement also indicated his awareness that Bright

had "quite a few automatic weapons" and his belief that Bright might have killed someone in the past. Finally, both Markley's testimony and Betts' statement support the conclusion that Betts and Bright were close friends.

**5.** We are satisfied that any error that occurred in admitting evidence of Bright's violent character without proof of Betts' awareness was harmless.

quently talked about and participated in acts of violence. This information was important for the jury to have to evaluate Betts' claim that he did not know that Bright intended to kill Pfeil. The fact that Betts and Bright were friends and that Bright frequently talked about or engaged in violent acts would tend to reflect negatively on Betts. However, to a large degree, this prejudice was already present in the case before the evidence in question was admitted. Betts admitted from the outset that he had been the driver of the car in the murder and that Bright had killed Pfeil. On balance, we conclude that Judge Greene could properly determine that the evidence concerning Bright's statements concerning his prior violent acts and his violent reputation were admissible to show Betts' knowledge.

Betts also contends that he was denied his constitutional right to confrontation by the admission of the statements of Bright. United States Const. amend. VI; Alaska Const., art. I, § 11. In general, out-of-court statements which are admitted for nonhearsay purposes or long-established exceptions to the hearsay rule do not violate the accused's right to confront the prosecution's witnesses. *Stumpf v. State*, 749 P.2d 880, 894 (Alaska App.1988), *cert. denied* —— U.S. ——, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). Most of the statements about which Betts complains were admitted as nonhearsay statements to show Betts' knowledge. Therefore Betts does not have a proper confrontation clause objection. Betts probably does have a proper confrontation clause and hearsay objection to Bright's statement that he and Betts were friends. However, the admission of this testimony, if erroneous, would be harmless error since other unchallenged evidence established the friendship between the two men, including Betts' own statements. We accordingly find no error.[6]

The conviction is AFFIRMED.

SINGLETON, J., not participating.

---

6. Betts also argues that his conviction should be reversed because of cumulative error. He raises no new points under this heading, but contends that the previous issues which he has raised, taken together, should result in reversal of his conviction. We have considered this point but conclude that Betts' conviction should be affirmed for the reasons which we have previously given in discussing the other points which he has raised.