Gregory J. BEAUDOIN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7739.

Court of Appeals of Alaska.

Oct. 25, 2002.

**44.** *Id.*

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In the summer of 1995, Gregory Justin Beaudoin was struck by a motor home; the resulting brain injury left him permanently disabled and mentally ill. On the evening of September 14, 1997, Beaudoin argued with his mother and fatally stabbed her. Beaudoin then called 911 to report what he had done and to request help for his mother.

Beginning with this 911 call, Beaudoin repeatedly confessed to a number of people. Beaudoin stayed on the telephone, talking to the 911 dispatcher, while emergency medical technicians, officers of the Alaska State Troopers, and a security officer employed by the Alyeska Resort arrived at his Girdwood home. Beaudoin repeatedly confessed to the 911 dispatcher that he had stabbed his mother; he described how many times he had stabbed her, he said that he was fairly sure that he had stabbed her in the heart, and he told the dispatcher where he had put the knife after the attack. Beaudoin also walked up to the Alyeska security officer, announced, "I stabbed my mother", and began to describe the assault.

After the emergency medical technicians determined that Beaudoin's mother was dead, Trooper Gary Pacolt placed Beaudoin in handcuffs and led him outside to a patrol vehicle. As they walked down the hallway, another tenant in the building opened his door and looked out. Beaudoin announced to this neighbor that he had just stabbed and killed his mother.

After Trooper Pacolt put Beaudoin in the patrol car, he began to question him. Pacolt was a rookie, and he neglected to give Beaudoin *Miranda* warnings until a trooper sergeant arrived and reminded Pacolt to do this. After Beaudoin received *Miranda* warnings, the trooper sergeant took up the interrogation. Beaudoin continued to confess. Beaudoin was then taken to the trooper station, where he was questioned by a trooper investigator. The trooper investigator again warned Beaudoin of his *Miranda* rights, but Beaudoin continued to confess (at length).

Beaudoin was indicted for first-degree murder; he was ultimately found "guilty but mentally ill". (That is, the jury found that the crime of first-degree murder was proved, but that Beaudoin, because of his mental illness, was unable to appreciate the wrongfulness of his conduct or, alternatively, was unable to conform his conduct to the requirements of law. *See* AS 12.47.030.)

Beaudoin now appeals his conviction and his sentence on various grounds. For the reasons explained here, we affirm the judgement of the superior court.

*The admissibility of Beaudoin's statements to the trooper sergeant and the trooper investigator*

■ Because Beaudoin did not receive *Miranda* warnings during the first segment of his custodial interrogation (his interview in the patrol car with Pacolt), the State conceded that Beaudoin's statements to Pacolt should be suppressed. However, the superior court allowed the State to introduce the statements that Beaudoin made during the second and third segments of his custodial interrogation—his statements to the trooper sergeant at the scene and, later, to the trooper investigator at the station.

On appeal, Beaudoin argues that these second and third segments should also be suppressed as the tainted fruit of the *Miranda* violation. Beaudoin contends that he "let the cat out of the bag" when he spoke to Trooper Pacolt before receiving *Miranda* warnings, and that he therefore believed that he had nothing to lose when he continued to confess during the second and third segments of the interrogation.

Because Beaudoin takes this view of the matter, he argues that his appeal requires us to decide a legal issue that has not yet been resolved by the appellate courts of Alaska: whether Alaska will follow the decision of the United States Supreme Court in *Oregon v. Elstad.*[1] In *Elstad,* the Supreme Court rejected Beaudoin's "cat out of the bag" theory of taint; instead, the Supreme Court con-

1.  470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

cluded that the administration of *Miranda* warnings will normally dissipate whatever coercive pressure might have been exerted earlier on a suspect in custody—so that the suspect's ensuing confession will be admissible despite the arguable psychological effects of the suspect's prior, un-Mirandized confession.[2]

In his brief, Beaudoin argues that we should adopt the position espoused by Justice Brennan in his *Elstad* dissent. That is, Beaudoin asks us to reject *Elstad* as a matter of state constitutional law and instead adopt the pre-*Elstad* rule that an illegally obtained confession presumptively taints a suspect's ensuing confession unless the government rebuts this presumption by proving, under the totality of the circumstances, that the ensuing confession was "sufficiently an act of free will to purge the primary taint"— that there was a "break in the stream of events sufficient to insulate the subsequent statement from the effect of all that went before".[3]

Having considered this matter, we conclude that Beaudoin's case does not present an *Elstad* issue.

The issue that divided the *Elstad* majority from the *Elstad* dissenters (and the issue that has fueled the ensuing debate in state courts) is whether a confession obtained in violation of *Miranda* will be presumed to taint any subsequent confession that a suspect makes after receiving *Miranda* warnings. The underlying premise of this debate—and the premise of the "cat out of the bag" theory of taint—is that the suspect's *initial confession* was obtained illegally as the result of a *Miranda* violation.

In his *Elstad* dissent, Justice Brennan criticized the majority for "reject[ing] ... the long-recognized presumption that an *illegally extracted* confession causes the accused to confess again out of the mistaken belief that

he already has sealed his fate".[4] (Emphasis added) Justice Brennan then approvingly quoted the separate opinion of Justice Harlan in *Darwin v. Connecticut:*[5]

A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think that he has little to lose by repetition. *If a first confession is not shown to be voluntary,* I do not think a later confession that is merely a direct product of the earlier one should be held to be voluntary. It would [not be] fair to a suspect to allow the erroneous impression that he has nothing to lose to play the major role in a defendant's decision to speak a second or third time.

In consequence, when the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has the burden of proving ... that [the later confession] was not directly produced by the existence of the earlier [involuntary] confession.

*Elstad,* 470 U.S. at 326, 105 S.Ct. at 1302 (Brennan, J., dissenting) (emphasis added).[6]

Thus, the reasoning of the pre-*Elstad* cases and Justice Brennan's *Elstad* dissent hinges on the premise that a suspect's initial confession was obtained illegally. The concern expressed by Justice Brennan is that the state takes unfair advantage of a suspect if (a) the police induce the suspect to confess by failing to inform him of his *Miranda* rights and then (b) the suspect, laboring under the psychological effects of the illegally obtained confession, repeats the confession (even after receiving *Miranda* warnings) because the suspect believes that there is nothing to lose by continuing to confess. The pre-*Elstad* rule and the *Elstad* dissent are premised on skepticism as to whether *Miranda* warnings, standing alone, can dispel the psychological effects of an earlier, illegally obtained confession.

---

**2.** *See id.,* 470 U.S. at 310–11, 105 S.Ct. at 1294.

**3.** *Halberg v. State,* 903 P.2d 1090, 1094 (Alaska App.1995), quoting (respectively) *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975), and *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967).

**4.** *Elstad,* 470 U.S. at 319, 105 S.Ct. at 1298.

**5.** 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968).

**6.** Quoting *Darwin,* 391 U.S. at 350–51, 88 S.Ct. at 1490 (Harlan, J., concurring and dissenting).

But that is not the issue in Beaudoin's case. Even if we assume that Beaudoin's willingness to confess to the trooper sergeant and the trooper investigator can be attributed to the psychological effects of his many earlier confessions, the fact remains that all but one of these earlier confessions were *lawfully* obtained.

Beaudoin freely and repeatedly confessed to several people before he was taken into custody and questioned by Trooper Pacolt in the patrol car. If Beaudoin indeed felt that he had nothing to lose by continuing to confess, that feeling did not stem from his conversation with Pacolt and Pacolt's failure to advise Beaudoin of his *Miranda* rights. Beaudoin's un-Mirandized conversation with Pacolt was a minor interruption in what was otherwise a stream of legally obtained confessions. Under these circumstances, no matter whether we apply the *Elstad* rule or the pre-*Elstad* rule, Beaudoin's subsequent confessions to the trooper sergeant and the trooper investigator were not tainted by the *Miranda* violation.

*The admissibility of evidence that Beaudoin assaulted a corrections officer*

■ While Beaudoin was imprisoned in Anchorage awaiting his trial, he assaulted a corrections officer. (The officer had ordered Beaudoin to return to his cell; Beaudoin moved behind the officer's desk, then struck the officer in the eye, breaking her glasses and cutting her face. The wound required several stitches.) At Beaudoin's trial, this assault became a point of contention.

Beaudoin was charged with first-degree murder. He defended on the theory that, due to his mental illness, he did not act with the intent to kill his mother. (Beaudoin conceded that he was guilty of a lesser degree of homicide.) To support this defense, Beaudoin called several expert witnesses (a neurologist, a neuropsychologist, a psychiatrist, and a psychologist) to analyze his mental functioning and to reconstruct his likely mental state when he attacked his mother.

When the prosecutor received a copy of the notes prepared by one of Beaudoin's witnesses, psychologist Fred Wise, the prosecutor observed that Dr. Wise had been informed of, and had considered, Beaudoin's assault on the corrections officer. The prosecutor therefore asked the trial judge, Superior Court Judge Milton M. Souter, for permission to cross-examine Dr. Wise concerning this incident.

Before ruling on the prosecutor's request, Judge Souter conducted a *voir dire* examination of Dr. Wise outside the presence of the jury. Dr. Wise testified that, when he interviewed Beaudoin, he asked Beaudoin about the assault on the corrections officer. Beaudoin told Dr. Wise that he struck the officer three times: once because she reminded him of his mother, once because she would not let another inmate use the telephone, and once "because he thought he was cool". Dr. Wise acknowledged that Beaudoin's assault on the corrections officer was one factor that he considered when assessing Beaudoin's thinking processes and his mental state on the night of the murder.

After hearing Dr. Wise's *voir dire* testimony, Judge Souter concluded that evidence of the assault on the corrections officer, and Beaudoin's explanation of this assault, was relevant to the jury's evaluation of Dr. Wise's analysis and conclusions concerning Beaudoin's mental state. The judge therefore allowed the prosecutor to pursue the requested cross-examination.

On appeal, Beaudoin argues that this ruling was error. He contends that evidence of his assault on the corrections officer was barred by Alaska Evidence Rule 404(b)(1) because the only real purpose of this evidence was to portray Beaudoin as a characteristically assaultive person.

As we explained in *Smithart v. State*[7], Evidence Rule 404(b)(1) bars the admission of evidence of a person's other bad acts if this evidence is introduced for a particular prohibited purpose: to prove a person's character so that this character can be used as circumstantial evidence that the person acted

---

7. 946 P.2d 1264, 1270–71 (Alaska App.1997), *reversed on other grounds*, 988 P.2d 583 (Alaska 1999).

true to character during the incident being litigated. But Rule 404(b)(1) does not bar evidence of a person's bad acts if this evidence is introduced for any other valid purpose.

In Beaudoin's case, Judge Souter found that the evidence of Beaudoin's assault on the corrections officer was relevant, not because of what it might show about Beaudoin's character, but rather because this information was pertinent to the jury's evaluation of Dr. Wise's testimony (his assessment of Beaudoin's mental state) and, ultimately, Beaudoin's claim of diminished capacity. The record fully supports Judge Souter's view of this matter. Thus, the disputed evidence was not barred by Evidence Rule 404(b)(1)—because it was relevant for a purpose other than the one purpose prohibited by Rule 404(b)(1).

■ Beaudoin argues in the alternative that the disputed evidence still should have been excluded under Evidence Rule 403 because its potential for unfair prejudice outweighed any proper probative value that it might have. But the potential for unfair prejudice was slight. Beaudoin did not dispute that he had attacked and killed his mother. The issue litigated at his trial was whether Beaudoin acted with the intent to kill his mother when he attacked her or whether, because of his mental illness, he lacked the intent to kill. In this context, it is inconceivable that the jury would be moved to "overmastering hostility" [8] against Beaudoin because he struck and injured a corrections officer. Rather, the jurors could be expected to use the disputed evidence in the proper way—as information pertinent to their decision concerning Beaudoin's mental state at the time of the homicide. Judge Souter did not abuse his discretion when he

allowed the prosecutor to cross-examine Dr. Wise concerning this incident.[9]

*Judge Souter did not violate the rule of Jackson v. State when he sentenced Beaudoin*

■ In *Jackson v. State*, the Alaska Supreme Court criticized trial court judges for sentencing defendants to a much longer prison term than the amount of imprisonment that the judge thought the defendant really should serve, under the assumption that the Parole Board would release the defendant soon after the defendant became eligible to apply for parole.[10] Beaudoin argues that Judge Souter violated the *Jackson* rule when he sentenced Beaudoin.

Beaudoin was convicted of first-degree murder. The maximum sentence for this crime is 99 years' imprisonment, while the mandatory minimum sentence is 20 years' imprisonment.[11] Judge Souter sentenced Beaudoin to 99 years with 39 years suspended—*i.e.*, 60 years to serve.

Under Alaska law, defendants who are not subject to presumptive sentencing are generally eligible to be considered for discretionary parole release after they have served either one-fourth or one-third of their sentence (depending on the class of crime they have been convicted of).[12] Because Beaudoin was convicted of first-degree murder, he was sentenced under AS 12.55.125(a), and thus the one-third limit applied to him.[13] However, two other factors also limited Beaudoin's eligibility for parole.

First, the parole statute provides that, regardless of any other limit on parole, defendants must serve the mandatory minimum sentence for their crime before they become eligible for parole release. For Beaudoin, this mandatory minimum sentence was 20

---

8. *Adkinson v. State*, 611 P.2d 528, 532 & n. 15 (Alaska 1980) (citing Charles McCormick, *The Law of Evidence* (2nd ed.1972), § 190, p. 453, and the Commentary to Alaska Evidence Rule 403, fifth paragraph).

9. *See Betts v. State*, 799 P.2d 325, 330 (Alaska App.1990) (a trial judge's decision to admit or exclude evidence of a person's bad acts is to be affirmed unless it constitutes an abuse of discretion).

10. 616 P.2d 23, 24–25 (Alaska 1980).

11. *See* AS 12.55.125(a).

12. *See* AS 33.16.090–100, especially AS 33.16.100(c)-(d).

13. *See id.*

years. Second, Alaska law restricts the parole eligibility of defendants who, like Beaudoin, are found guilty but mentally ill. Under AS 12.47.050(b) and 050(d)(2), such defendants can not be released on parole until they no longer suffer from a mental disease or defect that causes them to be dangerous to the public.

It is apparent from Judge Souter's sentencing remarks that one of his reasons for sentencing Beaudoin to serve 60 years was to make sure that Beaudoin would be eligible for parole at the earliest opportunity *if* Beaudoin was no longer a danger to the public.

Regardless of what sentence Beaudoin received, he could not be paroled until he had served the 20–year mandatory minimum term for first-degree murder. Judge Souter noted that, because one-third of 60 is 20, these two limitations on Beaudoin's parole eligibility—the requirement that he serve one-third of his sentence, and the requirement that he serve the mandatory minimum sentence—would coincide.

Judge Souter explained that the only remaining restriction on Beaudoin's parole eligibility stemmed from the jury's "guilty but mentally ill" verdict: because of this verdict, Beaudoin would not be eligible for parole until he no longer suffered from a mental disease or defect that caused him to be dangerous. The judge expressed the hope that, with advances in medicine (pharmacology, mental health treatment, and even reconstructive surgery of the brain), that time would arrive within the next two decades. But Judge Souter added that if Beaudoin's mental illness could not be cured or controlled, then his aim in imposing a 60 year sentence was to make sure that Beaudoin remained in prison for the protection of the public.

Given these remarks, it is obvious that Judge Souter did not calculate Beaudoin's term of imprisonment using the assumption forbidden by *Jackson*—the assumption that Beaudoin should be sentenced to three times the proper term of imprisonment because the Parole Board would release Beaudoin as soon as he became eligible to apply for parole.

It is true that Judge Souter took parole eligibility into account when he sentenced Beaudoin to serve 60 years. But the judge's aim in doing so was not to ensure that Beaudoin served at least 20 years. Beaudoin faced a mandatory 20 years in prison no matter what Judge Souter did. Rather, Judge Souter's aim was to leave the possibility open that Beaudoin might be *released* in as little as 20 years. This was not a violation of *Jackson*.

*Judge Souter did not abuse his discretion when he denied Beaudoin's motion to reduce the sentence*

■ Following his sentencing, Beaudoin filed a motion for sentence reduction under Alaska Criminal Rule 35(b). In this motion, Beaudoin presented a new evaluation from neuropsychologist Paul Craig. Dr. Craig stated that Beaudoin was responding well to drug treatment, that Beaudoin's behavior in jail had been excellent, and that there had been a "dramatic improvement in [Beaudoin's] interpersonal skills, clarity of thought, and capacity to communicate". Based on Dr. Craig's evaluation, Beaudoin asked Judge Souter to reduce his time to serve to 20 years (*i.e.*, change the overall sentence to 99 years with 79 years suspended).

Judge Souter denied this motion. He declared that, despite Dr. Craig's evaluation, "the Court's reasons for imposing the [original] sentence ... remain valid and undiminished".

As already explained, Judge Souter wanted Beaudoin to be eligible for supervised release after 20 years *if* Beaudoin no longer suffered from a mental disease or defect that caused him to be dangerous. At the same time, Judge Souter wanted to make sure that Beaudoin remained in prison for a much longer time if Beaudoin continued to suffer from a mental condition that caused him to be dangerous.

Dr. Craig's new evaluation suggested that Beaudoin was making rapid steps toward mental health. But this improvement in Beaudoin's condition would not necessarily call for a change in Judge Souter's evaluation of the case or a change in the terms of Beaudoin's sentence. No matter what Judge Souter did, Beaudoin would have to serve the

20–year minimum sentence for first-degree murder. And Judge Souter could reasonably conclude that, if Beaudoin's progress toward mental health turned out to be temporary or was halted short of complete recovery, a 60–year sentence was still needed to protect the public. We therefore conclude that Judge Souter did not abuse his discretion when he declined to reduce Beaudoin's time to serve to 20 years.

*Beaudoin's sentence of 60 years to serve is not clearly mistaken*

■ As explained above, Judge Souter fashioned a sentence that would allow Beaudoin to be released in 20 years if he was no longer dangerous, but would hold Beaudoin in prison for as much as 60 years if he continued to be dangerous. Beaudoin contends that this sentence is clearly mistaken because Judge Souter failed to give adequate weight to the expert testimony offered by Beaudoin concerning the nature of his mental illness and the prospects for his successful treatment.

As the jury found, Beaudoin's act of murder was substantially influenced by his mental illness. Because of this linkage between his mental illness and his crime, Beaudoin argues that it is not necessary to incarcerate him for 60 years. He relies on psychological evaluations which conclude that his mental illness is treatable with medication, that he understands his condition, and that he is willing to follow any regimen of treatment. Based on these factors, Beaudoin cites the Alaska Supreme Court's decision in *Hansen v. State*[14] as authority for the proposition that Judge Souter should have imposed a more lenient sentence.

In *Hansen*, the supreme court reversed a third felony offender's sentence—reducing it to time served and directing the sentencing judge to release the defendant on probation—when the facts showed that the defendant

[suffered from] a clearly diagnosed mental illness; [that he had excellent] amenability to treatment; [that his] mental illness [was clearly linked to his] past anti-social behavior; [and that there was a] definite, prescribed course of treatment to mitigate the possibility of future criminal behavior. . . .

*Hansen,* 582 P.2d at 1047–48.

However, as the State notes in its brief, the true lesson of *Hansen* may be that an appellate court should hesitate before rejecting a trial judge's sentencing assessment in favor of the competing predictions of mental health experts regarding a defendant's future behavior. For despite the arguable reasons for optimism recited in the supreme court's opinion, Robert C. Hansen was already on his way to becoming the worst mass murderer in Alaska history. (Between the summer of 1971 and the time of his arrest in 1983, Hansen abducted, raped, and murdered at least seventeen women. He committed one of these murders just a few weeks after the supreme court ordered his release on probation.)[15]

This is not to suggest that Beaudoin can be likened in any way to Hansen. Beaudoin is a youthful first offender whose criminal behavior, Judge Souter found, was clearly linked to his brain injury and resulting mental illness. And, for the most part, Judge Souter agreed with the experts' characterization of the sources of Beaudoin's criminal behavior and their conclusion that the real solution was to cure Beaudoin of his mental illness. But as a result of that mental illness, Beaudoin attacked and killed his mother with little or no provocation. Given Beaudoin's demonstrated level of dangerousness, Judge Souter wanted to craft a sentence that would protect the public in case the predictions of Beaudoin's rapid recovery proved to be too optimistic.

Given all of these circumstances, Judge Souter's sentencing decision was a reasonable effort to protect the public and yet foster Beaudoin's treatment and rehabilitation. The judge was not obliged to accept

---

14. 582 P.2d 1041 (Alaska 1978).

15. *See* Bernard DuClos, *Fair Game* (St.Martins, 1993). This book is now out of print, but it is summarized at the following web site:

http://www.explorenorth.com/library/week-ly/aa021100a.htm (last visited September 30, 2002). *See also* Walter Gilmour and Leland E. Hale, *Butcher, Baker* (Onyx Books, 1991).

the most sanguine view of Beaudoin's prospects for recovery. In short, we do not find that Beaudoin's sentence is clearly mistaken.[16]

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**16.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).